(No. 32541.— ■)

WILLIAM A. COMPTON, SR., Appellee, *vs.* WILLIAM A. COMPTON, JR., *et al.*, Appellants.

*Opinion filed January 22, 1953—Rehearing denied March 24, 1953.*

GUMBART, GRIGSBY & GUMBART, of Macomb, for appellants.

BURREL BARASH, of Galesburg, for appellee.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

This is an appeal from a decree entered by the circuit court of McDonough County in a suit wherein appellee was plaintiff and appellants were defendants. William A. Compton, Jr., is plaintiff's son. The decree found that the two certain tracts of real estate described in plaintiff's complaint belonged to him and that the defendants hold title thereto as constructive trustees for his use and benefit. It directs the defendants to convey this real estate to the plaintiff forthwith and to let him into possession thereof. The decree further finds that the Western Union Telegraph Company bonds of the face value of $6000, referred to in defendants' counterclaim, are the property of the plaintiff; that the order of sequestration theretofore made by the court, under which said bonds were taken possession of by the sheriff of said county, should be forthwith dissolved; that an account should be taken between the parties to the suit, and that defendants' counterclaim should be dismissed for want of equity. The decree directs the defendants to execute, acknowledge and deliver to plaintiff a good and sufficient deed, conveying to him the real estate described in the complaint within 30 days from the date of the decree, and in default thereof that the master in chancery of the court, as commissioner, execute and deliver such deed, and that the cause be referred to the master to

state an account between the parties and to report his findings and conclusions.

The plaintiff is 88 years of age. He is a lawyer by profession and for the past 50 years has been engaged in the real-estate business in McDonough County. In the depression of the 1930's he lost property of considerable value by mortgage foreclosures, and in 1932 was in strained financial condition. He had only two pieces of real estate left, one being his home in the city of Macomb and the other being an 80-acre farm in McDonough County. The home was mortgaged for $3500 and the farm was mortgaged for $4600. In 1932, without the knowledge of his son, he executed and acknowledged a deed of the home property to his son and had it recorded in McDonough County. Two years later he executed and acknowledged a deed of the 80-acre farm to his son and likewise had it recorded. The son was living in California where he and his wife, Hilda Compton, the other defendant in the case, had lived together for many years. The son was engaged in the occupation of traveling salesman, most of the territory covered by him being in the State of Texas.

In the early 1940's the son acquired a 160-acre farm in McDonough County from his mother. He had his father look after it for him, the father's duties being to see that the farm was kept leased and that the tenant accounted for the landlord's share of the crops. Once a year the son and his wife would come to Macomb and visit with the senior Compton, talking over matters connected with the two farms and inspecting the property. The father insists he was to have the enjoyment of all the income from the properties, while his son contends he was to have only an amount necessary for his support. The son opened an account with Union National Bank of Macomb in the joint names of William A. Compton, Sr., and William A. Compton, Jr. The father sublet a part of the house in town and it was understood that the income from the two farms

would be deposited in the joint account; that the father would pay out of that account the taxes and whatever other sums were necessary for the proper upkeep of the farms and home and whatever sums were necessary for his own support in addition to the rent he received from the dwelling in town. Toward the end of the year the father would always report to the son the amounts collected for the landlord's share of the various crops raised on the farms in order that the son might have these figures to use in making out his annual income tax return. In March, 1947, while the defendants were visiting with the senior Compton at Macomb, he discussed with them the advisability of making a new deed to them for the two parcels of real estate he had conveyed to them during the depression, in order that the junior Compton and his wife might hold these properties in joint tenancy instead of as tenants in common. They were willing to have this done and at his request they accompanied the senior Compton to the court house. There he had a deed prepared in which he conveyed both properties to William A. Compton, Jr., and Hilda Compton, as joint tenants and not as tenants in common. This deed was signed by the senior Compton in the office of the circuit clerk, Herbert S. Bobbitt.

The relations between the senior Compton and his son and daughter-in-law remained very warm and friendly until the year 1951. In March of that year, while on their annual visit to Macomb, a little difficulty occurred between plaintiff on the one hand and defendants on the other. The elder Compton had withdrawn a little money from time to time from the joint account and had invested it in Western Union Telegraph Company bonds. His son and daughter-in-law knew about this and they never made any objection to it until their visit in March, 1951. At that time plaintiff had a total of such bonds amounting to the face value of $6000. He had purchased them for a little less than face value. On the visit last mentioned he ex-

hibited these bonds, or some of them, to his daughter-in-law. When she inquired what disposition he expected to make of the bonds he told her it was none of her business. When the son learned of his father's attitude he went to the bank and closed the joint account and notified the tenants on his farms not to make any further payments of rent to his father. Shortly afterwards the elder Compton filed this suit. In his complaint he alleged ownership of the dwelling in Macomb and the 80-acre farm, averred that he had deeded these parcels of real estate to his son by warranty deed; that there was no consideration for the conveyances; that he had continued to occupy the two-story dwelling in town, and had rented out part of it and had collected the rents, and that he had continued to manage the 80-acre farm and had rented it to tenants and received the landlord's share of the crops and rent therefrom; that in March or April, 1945, his son and daughter-in-law executed a deed reconveying the above-mentioned real estate to him; that this deed was later given to the defendants for safekeeping and they refused to return it upon demand.

The defendants answered, admitting that the plaintiff had been the owner of the two parcels of real estate mentioned in his complaint and admitting that he deeded these two parcels of real estate to them, the one in 1932 and the other in 1934. They admitted that the plaintiff remained in possession of the residence, but alleged that this was done by their consent. They denied that he was in possession of the 80-acre farm, denied that he had paid a part of the mortgage thereon, denied that they executed a deed to him in 1945 for the property above referred to; denied that they had retained possession of a deed belonging to plaintiff; denied that plaintiff had ever given a deed to them for safekeeping; denied that any demand was ever made for the return of a deed; denied that the plaintiff kept separate records as to the 160-acre farm and the 80-acre farm; de-

nied that plaintiff opened a joint bank account; denied his allegations as to withdrawals from the joint account; and denied his conclusions. They admitted that they paid a $4000 balance of a mortgage on the farm. They also filed a counterclaim in which they averred that they are the owners of the two parcels of real estate described in the complaint and have been owners of the city property since April, 1932, and of the 80-acre farm since December, 1934; averred that the plaintiff is the father of William A. Compton, Jr., and that the latter has permitted his father to occupy the premises in the city of Macomb as a dwelling house and to retain what rentals he could receive from the property for his support and maintenance; averred that the junior Compton heretofore authorized and empowered his father to act as his agent in managing the 160-acre farm owned by him in McDonough County, averred that about 1942 he opened an account with Union National Bank of Macomb in the joint names of himself and his father, and authorized his father to draw therefrom such amounts as were necessary for his support and maintenance over and above the rental received from the residence. The counterclaim further averred that the senior Compton had withdrawn from said account large sums in excess of those necessary for his support and maintenance; that he had collected large sums of money from the tenants of the 80-acre farm which were never placed in the joint account, as he was obliged by the agency agreement to do; and that he had purchased bonds of a face value of $6000 and paid for them out of the joint account; and the counterplaintiffs averred that these bonds were equitably their property and should be preserved. They prayed an order of sequestration of the bonds, accounting and other relief. On April 3, 1952, plaintiff amended his amended complaint in open court by changing the allegation that the defendants had reconveyed the property to him in 1945, to an allegation that this was done in 1946.

On the trial the plaintiff testified that in March or April, 1946, the defendants came to his home and he told them he wanted some deeds because they might get killed traveling; that they all went together to the circuit clerk's office and that he had the stenographer there make out a deed for the farm and the dwelling in town from them to him; that they signed this deed in the presence of Bobbitt, the circuit clerk, and that the circuit clerk took their acknowledgment. He said he got the deed and took it home and put in his steamer trunk and kept it until 1949; that in the Spring of 1949 Hilda Compton said that was not a very safe place to keep the deed and suggested letting her take it and put it in their safety box in their bank, in San Bernardino, California; that he had confidence in her and let her take the deed and that in the Spring of 1950 he asked her to give the deed back to him and she refused to do so. When it came to the defendants' side of the case the defendants produced in evidence the only deed pertaining to these properties that was ever signed and acknowledged in the presence of Herbert S. Bobbit, the circuit clerk of McDonough County. Instead of being a deed from the defendants to the plaintiff it was a deed from the plaintiff to the defendants and had been in possession of the defendants ever since it was executed, acknowledged and recorded. The defendants explained the reason for the elder Compton giving the deed to them when they testified that he told them he wanted them to have the property in joint tenancy, so that in the event his son died the son's wife would get the property. The son did testify to another deed, that the father never mentioned in his complaint or amended complaint or in his testimony in chief. The son testified on cross-examination that in the early 30's he and his wife executed and delivered to his father a deed to these two parcels of property, but that his father later tore that deed up in his presence in the father's room, saying that he would have no further use for it.

The senior Compton took the stand in rebuttal and testified that he now recalled the execution of the deed from himself to his son and daughter-in-law in the circuit clerk's office, in 1947, which the son had produced and introduced in evidence. The father then said that it was the quitclaim deed which his son and daughter-in-law had made to him in 1934 that he had afterwards given to his daughter-in-law for safekeeping. This evidence was objected to upon the ground that it was wholly irrelevant to the case made by the pleadings, and that it was not proper rebuttal. The court let the statement stand in so far as it could be said to be "an explanation of the deed." Other evidence was introduced on the part of the defendants, including several letters the plaintiff wrote his son, and particularly a letter written October 31, 1943, and another, written February 10, 1946. In the 1943 letter the plaintiff wrote to his son, "but the home and farm are yours and the home is worth $6000 and the 80 is worth $12,000 so you have a good equity in both properties." In the 1946 letter he wrote, "You are now sitting on the highest pinnacle of human glory, with 240 acres of McDonough County, Illinois, land all clear and two nice homes, one at 432 South Randolph Street, Macomb, and one in Crestland, California." The father failed to sustain the allegations of his amended complaint that appellants hold the property in trust.

A constructive trust is one raised by operation of law as distinguished from one created by the express words of some written instrument. It is imposed upon a person by a court of equity upon the ground of public policy so as to prevent him from holding for his own benefit an advantage which he has gained by reason of a fiduciary relation subsisting between him and others and for whose benefit it is his duty to act. A constructive trust arises when the legal title to money or property is obtained by a person in violation, express or implied, of some duty owing

to him who is equitably entitled thereto. (65 C.J. 223.) The authorities in Illinois seem to be unanimous that a constructive trust arises only when fraud is proved or when there is a fiduciary relationship in which the dominant party took advantage of the other. (*Miethe* v. *Miethe,* 410 Ill. 226; *Stephenson* v. *Kulichek,* 410 Ill. 139; *Gilbert* v. *Cohn,* 374 Ill. 452.) Where it is sought to establish a constructive trust by parol evidence, the proof must be clear and convincing, and so strong, unequivocal and unmistakable as to lead to but one conclusion. While the parties here are father and son there is no evidence that the son induced the father to make the deeds to him. On the contrary, the evidence is uncontradicted that the deeds were made by the father of his own volition and that the son did not know about them until afterwards. The record is barren of any evidence that the son ever said or did anything to induce the father to make the deeds. The uncontradicted evidence is that the plaintiff is a lawyer and that he is exceedingly familiar with real-estate transactions. In the depression he lost all his property except these two parcels, his home in town and his 80-acre farm. He did not confer with his son as to what he should do, nor did he ask any advice of his son. No doubt he considered himself better qualified on that score than his son was. He deeded these two pieces of property to his son and had the deeds recorded and then wrote and told his son what he had done. The deeds were unconditional conveyances of the fee. He did take a quitclaim deed back from his son in 1934, but he never recorded it, and according to his own testimony he did that for protection in the event that his son should meet accidental death. Later, when he decided it would be better to give his son and daughter-in-law a deed as joint tenants, he executed and delivered a deed to them for that purpose and it was recorded the same day. The quitclaim deed of 1934 was then of no further effect, and according to the son's testimony the father destroyed

it in his presence, so there is no proof of any abuse of confidence.

The only charge of fraud made in the complaint is the charge that in 1946 his son and daughter-in-law executed and delivered to him a deed conveying the property back to him; that he had that deed in his possession for about three years, and that he then gave it to his daughter-in-law for safekeeping; that in 1950 and again in 1951 he demanded the return of the deed and his demand was refused. Evidently he was in error about this, because no such transaction was proved. The son proved, and produced the deed as evidence, that in 1947 the father had deeded both of these properties to his son and daughter-in-law, by a deed in joint tenancy, because he wanted his son and daughter-in-law to hold the title as joint tenants with right of survivorship, so there is no evidence whatever to sustain the only charge of fraud made in the complaint. There cannot, therefore, be a constructive trust.

In this court plaintiff has presented a motion for leave to file another amended complaint. He says that he does this in order to make the pleadings conform with the proofs. The principal difference between the amended complaint on file when the case was heard in the trial court and the amended complaint proposed now to be filed is that the former alleged that about March 30, 1946, (changed to 1946 by amendment before the trial) the son and his wife executed and delivered to him a warranty deed reconveying both tracts to him; that this deed was not recorded by him, but was kept in a strongbox at his residence; that in April, 1949, the defendant, Hilda Compton, saw the deed in the strongbox at his residence, cautioned him him about keeping such a valuable document where it might be lost or destroyed, and suggested that it would be better if he permitted her to take the deed to her home in California and place it in their safety-deposit box; that having confidence in her and her husband he allowed her to take

the deed; and that afterwards she refused to return the deed to him on demand, whereas in the amended complaint now proposed to be filed plaintiff alleges that it was in 1934 that his son and daughter-in-law made the deed to him. We do not see how it would help plaintiff's situation if we were to allow his motion and permit him to file a second amended complaint, because the evidence in the record is uncontradicted that afterwards appellee deeded both of these properties to his son and daughter-in-law as joint tenants. Appellee does not claim, and there is no evidence in the record to indicate that the joint-tenancy deed he executed and delivered to appellant in March, 1947, is anything but a valid conveyance, so even if appellants had given appellee a quitclaim deed in 1934 that deed became inoperative and void when the joint-tenancy deed from appellee to appellants was made and delivered. We can see no purpose, therefore, in allowing the motion to file a second amended complaint, and that motion is denied.

The evidence in the case shows that appellee deeded these properties to his son so that his son would have them at his death. Appellee says that when he took the deed back from them he did not have it recorded because he wanted to fix everything so that when he passed away appellants would come in and take possession the same as if the deed to him had never been made. He said he merely wanted that deed for his protection if they got killed. Appellee also testified that his son knew appellee was to have the income and full control and management of those properties the rest of his life although his son had a deed outright to them. He says that there was nothing to that effect in the deed, but he trusted his son's honor and his son trusted his.

It is admitted by both parties that the father, appellee here, was to have some interest in the income from the house property located in Macomb and in the 80-acre farm. The father contends his interest was the full enjoyment of all such income. The record indicates that the son at

least believed this interest amounted to such sums as might be necessary to cover the living expenses of his father. The evidence in this case discloses many different communications between the parties, both oral and written, in practically all of which a distinction was drawn between the house and 80 acres and the 160 acres. The house and the 80 acres was continually referred to as belonging to the father, as well as the crops and income from both properties; whereas the 160 acres, together with the crops and income therefrom, were at all times ascribed to the son. When the produce of both farms was delivered for sale to the elevator, payment for crops produced on the 80 was always made by a check to the father, and the checks for the produce from the 160 acres were always made to the father as agent for the son. At all times the father had complete management of the residence property in Macomb as well as the enjoyment of the entire income therefrom. While the evidence discloses that the father once executed a lease of both the 80 and the 160 to one Wayne Hardesty by one instrument signed by him as agent for appellants, nevertheless nothing in the record disputes his testimony that he never managed the 80 acres as an agent for anyone except himself. He maintains he merely included the 80 acres in that lease as a matter of convenience and because the record title was in his son's name. It is a fact that the income from the 80 acres and the house was reported for income tax purposes each fiscal year as the income of the son. Nevertheless we are of the opinion that the conduct of the parties in general discloses that the father was to receive and did receive the income from the 80 acres and the house, although the son held title to both properties. The title of the son was held subject, however, to the right of the father to receive the income therefrom for his support during his lifetime.

We, therefore, hold that appellants are the owners, as joint tenants, of the two tracts described in the amended

complaint filed herein, and that they hold the fee-simple title thereto, subject to the appellee's right to the income therefrom.

In his amended complaint, besides his prayer that appellants be ordered to reconvey the property to him, there is a prayer that appellants be required to account to him for all rents, issues and profits of the 80-acre farm from March 1, 1951, and to pay over to him all the moneys which they have withdrawn from the joint bank account belonging to him, and his amended complaint also contains a prayer for general relief. It is not clear from the evidence whether appellee has been deprived of any of the rents, issues and profits of the farm accruing after March 1, 1951, nor is it clear from the evidence whether any of the money they withdrew from the joint account belonged to the plaintiff. If such there be, this is a matter that can be adjusted by agreement or in the trial court.

The record indicates that prior to the institution of this suit and during the last few months that the father managed all of the property, he purchased Western Union bonds in the par value of $6000. The son claims these bonds as his property. It is disclosed by the evidence that prior to the purchase of these bonds, the father informed the son that he intended the purchase. There was no objection on the part of the son, at any time, to the said purchase. Moreover, the record indicates the money used to purchase the bonds came from the income of the 80 with the exception of about $350 which the father took from the income of the 160 and which he paid back in a very short time. Without doubt, the bonds should and do belong entirely to the father. The son has no equitable claim against them.

The decree of the circuit court of McDonough County is therefore affirmed as to the ownership of the bonds and in all other respects is reversed and the cause is remanded to that court with directions to enter a decree finding that

the fee-simple title to the real estate involved herein is vested in appellants as joint tenants, subject to appellee's right to the income therefrom so long as he shall live, and for such further proceedings as to law and justice shall appertain for any necessary accounting between the parties.

*Affirmed in part, and reversed in part,*
*and remanded, with directions.*