EUGENE BEELMAN, Plaintiff-Appellant, *v.* BARBARA BEELMAN *et al.*, Defendants-Appellees.

Fifth District   No. 5—83—0463

Opinion filed January 12, 1984

Donald M. Samson, of Stiehl & Stiehl, of Belleville, for appellant.

Harry J. Sterling, P.C., of Fairview Heights, for appellees.

JUSTICE KARNS delivered the opinion of the court:

Eugene A. Beelman appeals from the judgment of the circuit court of St. Clair County, which raised a constructive trust in favor of his brother Raymond's estate on a residential property to which Eugene holds legal title evidenced by a properly recorded warranty deed executed by both Raymond Beelman and his wife, Barbara. Eugene's original action of forcible entry and detainer filed against Barbara and her counter suit for a declaration of a constructive or resulting trust were consolidated in a single bench trial. Eugene asks that the judgment be vacated and that either judgment be entered in his favor or the cause be remanded for a new trial.

Raymond and Eugene Beelman were brothers whose family had lived on the property in question since 1925. Raymond purchased the house and lots from his grandmother's estate in 1963. Following his marriage to Barbara in 1969, they made their home there until his death in 1981. Raymond operated two businesses in Belleville. Eugene

lived in Centralia where he was a plumber and owned several pieces of real estate. Although they enjoyed a trusting relationship, neither brother participated in the other's business affairs. Barbara was not on cordial terms with her husband's family, and Raymond visited them in Centralia only three or four times a year.

Raymond experienced continual financial difficulties and occasionally received small loans from his brother which were never repaid. In 1974, matters became more serious when it appeared that the Internal Revenue Service (IRS) was about to place liens on Raymond's home and business assets to satisfy unpaid income taxes amounting to several thousand dollars. In December 1974, Eugene gave $1,000 in cash to Raymond because he understood the IRS might move at any moment. Eugene testified that he "loaned" him the money and that Raymond agreed to getting some "loan papers" from the bank to document their transaction. When Raymond returned to Centralia a few days after receiving the $1,000, Eugene had obtained several copies of the "Mortgage Loan Record Book" used by The Old National Bank in Centralia which he wanted to use as guidelines for their agreement. Eugene reported that at this second meeting Raymond said, "I don't want to do it that way ***. I will sign the house over to you." Eugene agreed to this suggestion without question. Consequently, on January 13, 1975, Raymond and Barbara executed a warranty deed transferring the property to Eugene. The deed was recorded on January 14. Raymond kept the deed. The brothers never discussed the value of the house and made no arrangement for Raymond to pay rent. Raymond told his brother he would continue to pay all expenses and Eugene would not be expected to pay unless it became impossible for Raymond to do so.

Barbara characterized the transfer as an effort to shield the property from the tax liens. The idea of the transfer originated with Raymond and Barbara, but she contends that Eugene understood it for what it was. Eugene denies her assertions that he called her at home to express his understanding that he was only holding it for them until they got their affairs in order. There is conflicting testimony as to Eugene's knowledge of the unlisted number at the Belleville house. Raymond and Barbara reached an accord with the IRS, and no lien was placed against the house.

The transfer of title led to no change in the possession or use of the property. Barbara and Raymond continued to live there, paying the mortgage, the taxes, and maintenance expenses. During Raymond's final illness, Eugene did some minor repair work on the house. He required no accounting from Raymond and Barbara with

regard to taxes, expenses, insurance or mortgage payments and did not indicate on his income tax returns that he regarded their payments as rent on the property. On one occasion Eugene was informed by his uncle that taxes were due on the property. The uncle paid them.

In the period near the time of Raymond's death, Eugene took a greater interest in the house. In November 1981, he tried to insure it for $15,000, but the insurer cancelled the policy because it considered the house too great a risk. Just after Raymond's death, Eugene tried to borrow money on the house. At about the same time, he paid the remaining mortgage indebtedness of $818.55.

One week after Raymond's funeral, Eugene and Barbara made an abortive attempt to clarify their relationship with regard to ownership of the house. In one account Eugene pointed out to Barbara "this all belongs to me now." In a different version, she asked him to reconvey to her on condition she would leave the house to him in her will. Although Eugene predicted they would come to some agreement, they did not. On March 2, 1982, Eugene notified Barbara that he was willing to rent the house to her for $55 a week, but if she would not accept those terms he expected her to leave the house by March 12, 1983. She did not accept or leave. He sought immediate possession and filed an action for forcible entry and detainer which she countered with a petition for a declaration of a constructive trust. After consolidating the causes for trial, the court permitted Barbara to amend the pleadings to add Raymond's estate as an additional party and to include the theory of resulting trust as a basis for recovery. On July 5, 1983, the court declared a constructive trust on the property in favor of Barbara as the independent administrator of Raymond's estate. The court denied Eugene's post-trial motion to vacate the judgment and to enter judgment in his favor or to grant a new trial.

The trial court found that "the parties had originally agreed to a loan, but at some subsequent time Raymond Beelman and Eugene Beelman determined to transfer the property by warranty deed." It also found that there was a fiduciary relationship between the brothers and "[b]ecause of the relative financial positions of Eugene Beelman and Raymond Beelman, there was influence and superiority of Eugene over Raymond." The court apparently concluded that Eugene had abused his brother's confidence by taking title to the property and refusing to relinquish it to the estate.

We are asked to decide whether the imposition of a constructive trust is against the manifest weight of the evidence. We find that it is. Eugene also asks that we find Barbara's claim for equitable relief

is barred by her admission that the transfer of title was intended to foil the Internal Revenue Service. Without approving such a tactic, we nevertheless find that the equitable doctrine of clean hands does not bar her claim. If in attempting to shield her property from a tax lien, she intended no harm to Eugene against whom she now seeks redress, she may properly invoke the court's equity powers. *Metcalf v. Altenritter* (1977), 53 Ill. App. 3d 904, 369 N.E.2d 498.

■■■ When, as in the present case, a party seeks to have a constructive trust imposed in equity on the basis of parol evidence, the proof must be clear and convincing. (*Compton v. Compton* (1953), 414 Ill. 149, 111 N.E.2d 109.) It must clearly appear that the party against whom the trust is to be imposed has engaged in actual fraud or has abused a confidential or fiduciary relationship. (*Bremer v. Bremer* (1952), 411 Ill. 454, 104 N.E.2d 299.) A blood relationship is not sufficient to establish a confidential or fiduciary relationship. (*McCartney v. McCartney* (1956), 8 Ill. 2d 494, 134 N.E.2d 789.) It must be shown that the dominant party in a relationship built on trust has taken advantage of his superior position. (*Compton v. Compton* (1953), 414 Ill. 149, 111 N.E.2d 109.) When the servient party conveys property to the dominant party, the abuse of the trust relationship must consist of the dominant party's efforts to procure the conveyance to himself. (*McCartney v. McCartney* (1956), 8 Ill. 2d 494, 134 N.E.2d 789; *Miethe v. Miethe* (1951), 410 Ill. 226, 101 N.E.2d 571.) When all the evidence marshalled to prove a constructive trust is doubtful or may be reasonably explained by other theories, it is insufficient to support the imposition of a constructive trust. *Compton v. Compton* (1953), 414 Ill. 149, 111 N.E.2d 109.

■ There is no evidence that Eugene played any dominant role in Raymond's personal or financial life. Raymond visited Eugene in Centralia only occasionally. Eugene came by the Beelman home in Belleville even less frequently. It is not clear that Eugene had Raymond's unlisted telephone number. Although Barbara characterized the brothers' relationship as trusting, she admitted Eugene had no part in Raymond's businesses. His only contributions were small loans he never sought to have repaid. Eugene's real estate dealings in Centralia do not appear to have given him any authoritative position in his brother's life. The transfer of the Belleville property to Eugene was not Eugene's idea but originated with Barbara and Raymond as the only solution to their tax problems. We do not think the evidence provides clear and convincing proof of a fiduciary relationship between the brothers. The imposition of the constructive trust is therefore an inappropriate equitable remedy.

■ Although neither party has argued that the deed is an equitable mortgage, we think the evidence supports such a view and thus provides the basis for a just result. For that reason we choose to disregard the rule that issues not presented are waived. (*Anderson v. Smith* (1980), 91 Ill. App. 3d 938, 415 N.E.2d 643.) We are conscious that in considering a new theory we must take care that the parties are not deprived of the right to present argument. (*Hux v. Raben* (1967), 38 Ill. 2d 223, 230 N.E.2d 831.) In view of the fact that the parties testified extensively as to their intentions regarding the loan and deed as well as their subsequent relationship to the property, we do not believe they have been deprived of relevant argument.

■ ■ A deed which on its face appears to be an absolute conveyance is to be considered a mortgage if it appears that the parties intended it to serve only as a security. (Ill. Rev. Stat. 1981, ch. 95, par. 55.) Whether a deed is to be taken as a mortgage depends on the intention of the parties at the time of the execution of the deed. (*Warner v. Gosnell* (1956), 8 Ill. 2d 24, 132 N.E.2d 526; *Metcalf v. Altenritter* (1977), 53 Ill. App. 3d 904, 369 N.E.2d 498.) Any evidence tending to indicate that the parties intended to create a loan and security is admissible. (*Burroughs v. Burroughs* (1971), 1 Ill. App. 3d 697, 274 N.E.2d 376.) Relevant factors may include "[t]he relation of the parties, the circumstances surrounding the transaction, the appearance of the transaction, the adequacy of consideration and the situation of the parties after the transaction ***." (*Smith v. Fried* (1981), 98 Ill. App. 3d 467, 470, 424 N.E.2d 636, 638.) Parol evidence is admissible to establish an equitable mortgage. (*Wilkinson v. Johnson* (1963), 29 Ill. 2d 392, 194 N.E.2d 328; *Warner v. Gosnell* (1956), 8 Ill. 2d 24, 132 N.E.2d 526.) Whatever its nature, the body of evidence must provide clear, satisfactory and convincing proof that the deed absolute in form was intended to be a mortgage. (*Schwartzentruber v. Stephens* (1956), 8 Ill. 2d 222, 133 N.E.2d 33.) When a deed is intended by the parties to be a mortgage, the relationship created between the parties is that of equitable mortgagor and mortgagee. *Holt v. Duncan* (1962), 33 Ill. App. 2d 477, 180 N.E.2d 36.

■ To find that a deed was intended as a mortgage, it is necessary to determine that there was a debt. (*Evans v. Berko* (1951), 408 Ill. 438, 97 N.E.2d 316.) Eugene admits that he loaned Raymond $1,000 in cash. At the time he handed over the money, both parties contemplated treating the transaction as a loan to be repaid in the same way Eugene repaid his loan to The Old National Bank in Centralia. At their next meeting, Eugene had mortgage loan record books from the bank on hand. Clearly both parties understood the $1,000 to

be a debt to be repaid, presumably in an orderly fashion.

■ At a second meeting, Raymond rejected the original plan. Eugene interprets Raymond's declaration, "I don't want to do it that way ***. I will sign the house over to you," as an offer to sell the home to satisfy the $1,000 debt. At the time neither party spoke of a sale. Eugene simply agreed to do whatever Raymond wanted. Eugene made no inquiries about the property. There was no discussion concerning Raymond's obligation to pay rent to Eugene or to consult him about maintenance. Raymond said he would continue to pay for everything and Eugene would be expected to pay only if it became impossible for Raymond to do so. Although Raymond reportedly said he did not want the house back and he did not want Barbara to get it, he retained the original deed and Eugene was left to get a copy from the courthouse rather than demand the original from his brother. Raymond's decision to transfer his house to his brother came shortly after Barbara and Raymond agreed such a transfer would give them some protection from the IRS. In view of the pressure on Raymond of which Eugene was aware, and the failure of Eugene to inquire about or demand any of the rights of ownership, as well as the fact that Raymond owed Eugene only $1,000, we think the deed was not evidence of a sale but Raymond's alternative way of handling the debt to his brother and dealing with the IRS at the same time.

The events following the execution of the deed confirm the view that neither party considered Eugene the owner of the house. Barbara and Raymond continued to live there as before. Although Eugene said he checked to see that the taxes were paid, he did not communicate directly with Raymond or Barbara about keeping up with expenses. He either did not know or did not care that the house was uninsurable from 1976 until just before his brother's death when he tried to insure it for $15,000. Eugene took no part in deciding what repairs or improvements were made, although he did minor repairs and knew that the house was in "terrible condition" by the time of his brother's death. Eugene's income tax returns do not reflect his claims of ownership. He did not report the sums paid on the house by Raymond and Barbara as rental income nor did he claim deductions for the interest on the mortgage.

It was only in the period immediately before and after Raymond's death that Eugene took steps to secure the benefits of ownership to himself by insuring the house in his own name, borrowing money on it, and paying off the mortgage.

For the foregoing reasons, we reverse the judgment of the circuit court of St. Clair County and remand for further proceedings in ac-

692

cord with the views expressed above. The parties are allowed to amend their pleadings to conform to our conclusion that the transaction be treated as an equitable mortgage and that the parties be accorded the rights and duties usually accorded mortgagors and mortgagees.

Reversed and remanded.

HARRISON, P.J., and WELCH, J., concur.