ROSEMARY ROBINSON, Plaintiff-Appellant, v. BUILDERS SUPPLY AND LUMBER COMPANY *et al.*, Defendants-Appellees.—FIRST FEDERAL SAVINGS BANK OF PROVISO TOWNSHIP, Plaintiff-Appellee, v. ROSEMARY ROBINSON, Defendant-Appellant (Builders Supply and Lumber Company *et al.*, Defendants-Appellees).

First District (6th Division)   No. 1—90—2510

Opinion filed November 22, 1991.—Modified on denial of
rehearing January 17, 1992.

Edwin Cabey and MaNina M. Harper, both of Chicago, for appellant.

William E. McNulty and Michael Gilman, both of O'Brien, O'Rourke, Hogan & McNulty, of Chicago, for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

This appeal arises from two consolidated cases. In the first, plaintiff, Rosemary Robinson, brought an action against Builders Supply & Lumber Company (Builders) and others seeking specific

performance of an agreement pertaining to a single family residence and a multi-unit building in Maywood, Illinois. In the second case, First Federal Savings Bank of Proviso (First Federal) sought to foreclose on the single-family residence after Builders defaulted on a note secured by a mortgage on that property. After a hearing, the circuit court of Cook County denied plaintiff's motion for summary judgment against First Federal, and granted Builders' countermotion for summary judgment and entered judgment of foreclosure for First Federal.

The relevant facts adduced from the pleadings, depositions, documents, and affidavits are as follows: Plaintiff and her husband owned a building at 840-852 South 17th Avenue, Maywood (the building) and a house at 818 South 21st Avenue, Maywood, Illinois (the house), each held in joint tenancy with right of survivorship. Upon her husband's death in 1979, title to both properties passed to plaintiff. She and her husband had resided in the house since the late 1960's and she continues to occupy the house. The building contains nine apartments and four stores, including "Robinson's Cafe," which plaintiff and her husband operated prior to his death. Plaintiff's affidavit, filed in May 1989, stated that she was 70 years old, had completed two years of high school, had worked as a bar maid and cook prior to her husband's death and that she had "never conducted any business affairs." She failed to pay the 1978 taxes on the building, and National Indemnity Corporation (National Indemnity) purchased the 1978 and 1980 taxes. In May 1982, plaintiff entered into an agreement with National Indemnity, which gave her an option to repurchase the building for $30,398.44 by November 30, 1982, after which time she would lose her interest in the building. National Indemnity hired attorney David Z. Feurer to get the taxes on the building reduced and plaintiff agreed to assume National Indemnity's $1,500 obligation to Feurer if he successfully reduced the taxes and if plaintiff subsequently repurchased the building pursuant to the agreement. In June 1982, plaintiff unsuccessfully applied for a commercial loan to repurchase the building from National Indemnity. She also tried to borrow the money from friends. At the time, she "did not think of trying to get a loan using the House as collateral." In October 1982, an acquaintance suggested that Joseph Willens, president of Builders, could assist her. When Willens, then 83 years old, contacted plaintiff, she told him that she needed $40,000 to redeem her building. According to her, Willens agreed to lend her "thirty some thousand dollars plus interest and to give her 30 months to repay it."

Plaintiff and Builders subsequently entered into an agreement, the intent and terms of which are disputed. On November 30, 1982, at Builders' office plaintiff signed the documents presented to her without a reading or an understanding of them. On that date, plaintiff executed two deeds, conveying the house and building to Builders in the presence of Willens, and Anthony Bruno, Builders' attorney, along with another employee of Builders. No closing documents were executed nor was an attorney present on plaintiff's behalf. Willens told Feurer about the transaction, and Feurer advised plaintiff by letter dated November 30, 1982, that he disapproved of the agreement. In the letter Feurer explained that plaintiff had transferred ownership of the house and building to Builders and that she retained an option to repurchase the property by 24 monthly payments of $1,700 each. Plaintiff denied that Feurer assisted or represented her in her efforts to repurchase the properties from National Indemnity and stated that she never spoke to Feurer about the transaction with Builders.

On December 9, 1982, Builders and plaintiff entered into an installment contract for warranty deed to the house with an option to repurchase the building. She did not read the agreement before signing it, stating that she "did not understand the document, but thought that it was necessary for the agreement I had made with Builders for a loan of $40,000." Plaintiff understood that Builders would pay National Indemnity $34,726.50 to buy back the taxes on the building, and that this loan from Builders would be repaid over 24 months in $1,700 monthly installments, totalling $40,800. The monthly payments were to come from the net rentals of the building.

Anthony Bruno, attorney for Builders, testified at his deposition that Builders was in the business of buying, rehabilitating and reselling distressed properties. Typically, after purchasing a distressed property, Builders would obtain a mortgage on it sufficient to cover the purchase price and the estimated cost of repairs. According to Bruno, Builders was also in the business of lending money.

Bruno testified that plaintiff came to Builders in order "to save her building," and "to achieve redemption in some fashion so that the building wouldn't go to tax purchasers." He stated that the parties agreed that "the most convenient way to handle this transaction" was for Builders to buy the building and house from plaintiff for $40,000, and allow her to "eventually repurchase the property for an agreed upon price." Bruno drafted the legal documents, including the two warranty deeds and the installment agreement for

warranty deed. The agreement required plaintiff to pay $2,156.62 monthly for 30 months, totalling $50,354.24, in order to repurchase the property. Bruno stated that both Willens and plaintiff anticipated at the time of signing that the net rentals would be sufficient to cover the monthly payments and that she would not need to make any monthly payment. Bruno also stated that the agreement required plaintiff to pay monthly any advances by Builders for reasonable expenses.

The parties dispute the amount of consideration paid by Builders. Builders claims that "the purchase price" for the property was $50,354.24, consisting of three elements: $34,726.50 paid to National Indemnity; $3,354.24, paid to Frank M. Spatz to clear a lien on the property; and $12,273.50 paid to plaintiff by cashier's check. Plaintiff stated that she never received a cashier's check from Builders. She also stated that she gave Builders $2,000 to cover in part the money owed Spatz. The record contains copies of the following "purchaser's receipts" for cashier's checks drawn by Willens: $11,500 to Rosemary Robinson, dated November 30, 1982; $12,273.50 to Rosemary Robinson, dated December 2, 1982 (Builders for some reason not clear in the record issued two checks to plaintiff); $32,000 to Chicago Title & Trust Company (CT&T) dated November 30, 1982; $2,726.50 to CT&T, dated December 2, 1982; and $34,726.50 to Chicago Title, dated December 10, 1982. Bruno testified regarding the alleged payment to plaintiff that he did not remember

> "who, what or where relative to the funds, other than a general memory that she was in financial trouble at the time and that she wanted money for various reasons. And apparently this was—she wanted this money for whatever reasons, and she got it. I don't know."

Bruno explained that several cashier's checks were drawn for CT&T because the transaction was delayed and the figures changed.

On December 2, 1982, Builders applied to First Federal for a $40,000 loan to be secured with a mortgage on plaintiff's house. The application valued the house at $52,000. Builders executed the note on December 13, 1982, and the mortgage was recorded on December 29, 1982. In February 1983, Builders sought to cancel the agreement because of problems in clearing title. Feurer objected and demanded that Builders disburse the funds.

Builders subsequently collected rents and paid real estate taxes and operating expenses for the building. Additionally, Builders

leased the restaurant to plaintiff and made mortgage payments on the house. In July 1983, Builders evicted plaintiff from the restaurant for nonpayment of rent and obtained a $2,100 judgment against her. Bruno stated that it became clear by August 1983 that the income from the building failed to meet the operating expenses and "various non-operating expenditures" that Builders incurred. The record contains a statement prepared by Builders, dated August 26, 1983, which indicated that operating expenses exceeded rentals by $501.14 and that plaintiff owed $19,173.78 under the contract from the period from December 1982 to date. The record contains a corresponding document dated September 1983. Neither document details the expenses. Plaintiff stated that she was not notified of any shortages until January 1984. Builders' 1983 tax return indicates that the rental payments exceeded operating expenses by $7,804. On November 25, and December 23, 1983, Feurer by letters requested a complete accounting of all income and expenses incurred. Builders did not respond. In January 1984, Builders paid back taxes on the building for 1979 and 1981 in the amount of $25,422.93.

On January 11, 1984, Builders served plaintiff with a notice of its intent to cancel the agreement within 30 days, and subsequently presented a formal notice of default dated February 15, 1984. Bruno stated that he had not informed plaintiff that she was in default prior to this time, nor did he know whether Builders or Willens did. On February 2, 1984, Builders sold the building for $100,000, and in May 1984 filed an action against plaintiff to evict her from the house. Builders subsequently defaulted on its loan and in May 1988 First Federal filed an action to foreclose on the mortgage.

On June 24, 1984, plaintiff filed a complaint against Builders and others, including First Federal, seeking specific performance of the agreement, damages for breach of contract arising from the sale of the building, a declaration that the deeds were equitable mortgages, and other relief. The circuit court of Cook County consolidated these cases in July 1988.

Plaintiff subsequently filed a motion for summary judgment against First Federal for a ruling in her favor on whether her transaction with Builders was a sale or equitable mortgage, alleging that no material factual issues existed. Builders filed a countermotion for summary judgment on the same issue. After a hearing on the cross-motions for summary judgment, the court denied plain-

tiff's request for summary judgment and granted Builders' motion. The court ruled as follows:

"[A]s to [plaintiff's] motion for summary judgment as against [First Federal], this court must rule that summary judgment must be denied. No way was an equitable mortgage created. There was no indebtedness between the parties, and there are triable issues of fact involved.

\* \* \*

As to the motion for summary judgment prayed for by [Builders], the court \* \* \* finds that as to them there are no triable issues of fact, there was no equitable mortgage, this court of necessity must state that there was an absolute deed passed, there was a default. Motion for summary judgment as to [Builders] will be granted."

The court also entered judgment of foreclosure on behalf of First Federal.

On appeal, plaintiff contends that the trial court improperly denied summary judgment on whether the Builders' transaction constituted an equitable mortgage and improperly granted Builders summary judgment on the same issue. In addition, plaintiff claims that the trial court erred in granting summary judgment for Builders on the issues of the alleged default and her right to an accounting on the agreement. Thus plaintiff requests this court to reverse the trial court's order in its entirety.

The purpose of summary judgment is to determine the presence or absence of triable issues of fact, and in determining whether the moving party is entitled to summary judgment, the pleadings, depositions, admissions and affidavits should be strictly construed against the movant and liberally in favor of the opponent. (*Vincent DiVito, Inc. v. Vollmar Clay Products Co.* (1989), 179 Ill. App. 3d 325, 534 N.E.2d 575.) Summary judgment is proper when the parties agree on relevant facts and the record presents purely questions of law. (*J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.* (1990), 194 Ill. App. 3d 744, 551 N.E.2d 340.) When the facts allow for more than one conclusion, including one unfavorable to the movant, motion for summary judgment should be denied. (*Vincent DiVito, Inc. v. Vollmar Clay Products Co.*, 179 Ill. App. 3d 325, 534 N.E.2d 575.) Moreover, summary judgment is a drastic means of disposing of litigation and should be granted only when "the right to it is clear and free from doubt." (*Allstate Insurance Co. v. Tucker* (1989), 178 Ill. App. 3d 809, 812, 533 N.E.2d 1004, 1007.) Upon review, we conclude that genuine issues of mate-

rial fact existed which precluded summary judgment in Builders' favor on whether its transaction with plaintiff constituted an equitable mortgage and whether she defaulted under the agreement.

■■■ We note initially that under Illinois law a deed absolute on its face may be considered an equitable mortgage under certain circumstances. The relevant statute provides:

"Every deed conveying real estate, which shall appear to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage." (Ill. Rev. Stat. 1989, ch. 95, par. 55.)

Whether a deed is to be considered as an equitable mortgage depends on the parties' intentions. (*Beelman v. Beelman* (1984), 121 Ill. App. 3d 684, 460 N.E.2d 55.) To convert an absolute deed into a mortgage, the proof must be clear, satisfactory and convincing and may come from "almost every conceivable fact that could legitimately aid that determination." (*McGill v. Biggs* (1982), 105 Ill. App. 3d 706, 708, 434 N.E.2d 772, 773.) Indeed, our courts have recognized and considered a number of factors, including the following:

"the existence of an indebtedness, the close relationship of the parties, prior unsuccessful attempts for loans, the circumstances surrounding the transaction, the disparity of the situations of the parties, the lack of legal assistance, the unusual type of sale, the inadequacy of consideration, the way the consideration was paid, the retention of the written evidence of the debt, the belief that the debt remains unpaid, an agreement to repurchase, and the continued exercise of ownership privileges and responsibilities by the seller. [Citations.]" *McGill v. Biggs*, 105 Ill. App. 3d at 708, 434 N.E.2d at 774.

■ Our courts have repeatedly considered the adequacy of consideration in determining whether to apply the equitable mortgage theory. (*Wilkinson v. Johnson* (1963), 29 Ill. 2d 392, 194 N.E.2d 328; *McDonnell v. Holden* (1933), 352 Ill. 362, 185 N.E. 572; *Flack v. McClure* (1990), 206 Ill. App. 3d 976, 565 N.E.2d 131; *Beelman v. Beelman*, 121 Ill. App. 3d 684, 460 N.E.2d 55; *McGill v. Biggs*, 105 Ill. App. 3d 706, 434 N.E.2d 772.) Where the consideration is grossly inadequate, a mortgage is strongly indicated. (*McGill v. Biggs*, 105 Ill. App. 3d 706, 434 N.E.2d 772; *Burroughs v. Burroughs* (1971), 1 Ill. App. 3d 697, 274 N.E.2d 376.) In *Flack v. McClure*, defendant loaned plaintiff $9,000 in exchange for a quitclaim

deed to her home. At the same time, plaintiff signed a contract to sell her home to defendants for $80,000, which sale was never completed due to defendant's inability to acquire financing. This court rejected defendant's argument that the deed was an absolute conveyance of the property, emphasizing in part the inadequacy of the consideration. The court also rejected defendant's claim that the value of the property was significantly less than $80,000 due to its "poor condition." *Flack v. McClure*, 206 Ill. App. 3d at 986, 565 N.E.2d at 137.

This court in *McGill v. Biggs* also focused on the inadequacy of the consideration in finding an equitable mortgage. In *McGill*, the grantor of a quitclaim deed argued that he conveyed the deed to secure a loan to pay funeral expenses. The trial court found the evidence sufficient to show that the parties intended to create a debt arrangement and that the deed was a mortgage. In affirming, this court emphasized the inadequacy of the consideration, noting that it was less than 10% of the value of the property. Specifically, the property was valued at $15,000 and plaintiff signed what he believed was a contract to pay defendant a total of $1,725 over 15 months. The court also considered that consideration was paid to plaintiff's creditor, rather than plaintiff, and that the property was never advertised or offered for sale.

■ In this case, we find that the record lacks sufficiently conclusive evidence on the adequacy of consideration, specifically the amount Builders paid and the value of the properties, and, as such, creates a genuine issue of material fact. Builders argues that it paid the sum of $50,354.24 for the properties: $34,726.50 to National Indemnity; $3,354.24 to Spatz for his lien on the building; and $12,273.50 to plaintiff. The record, however, fails to support Builders' contention. There is no dispute that Builders paid nearly $35,000 to National Indemnity. The parties dispute, however, whether Builders paid plaintiff. She testified that she never received any money from Builders, and the record does not sustain Builders' claim that it paid her. Bruno testified that he did not recall whether plaintiff was paid. Moreover, the two purchaser's receipts for cashier's checks in Robinson's name fail to conclusively prove that Builders paid plaintiff, especially given plaintiff's conflicting testimony and Bruno's lack of knowledge or recall as to whether she was paid. Further, although Builders alleges that it paid $3,354.24 to Spatz for the lien and claims that such amount was part of the "purchase price," plaintiff states that she gave Builders a $2,000 check toward this amount on November 30, 1982.

If plaintiff received no money from Builders and, in fact, paid Builders $2,000 toward the lien, as she testified, then the amount of consideration paid totals approximately $36,000, not $50,354 as Builders claims.

Moreover, although Builders valued the house at $52,000 on its mortgage application, the record lacks sufficient evidence of the building's value to address the adequacy of consideration. The record is devoid of any actual valuation of the building, and the only evidence suggesting its value is the fact that Builders sold the building for $100,000 in January 1984. Builders maintains that the building's dilapidated condition diminished its value. Builders also maintains that it received only $46,000 from the sale after deducting for operating losses and capital expenditures, and suggests that this figure represents the value. Although the closing statement indicates that the amount due to Builders was reduced by approximately $50,000 for a loan and the 1982-84 property taxes, we believe that the sales price is more indicative of the value than the amount of cash Builders received from the sale. In the absence of evidence showing the building's value, we cannot conclude that, as a matter of law, the consideration was adequate. Construing the evidence presented strictly against Builders, we believe that genuine issues of material fact existed relative to the adequacy of consideration.

We also find *Flack v. McClure*, decided by this court subsequent to the trial court's decision in this case, instructive. In *Flack*, in addition to considering the adequacy of the consideration as discussed above, this court identified five other factors in deciding that an equitable mortgage existed. These included: the existence of a debt; the relationship between the parties; the availability of legal counsel; the sophistication and circumstances of the parties; and whether the grantor of the deed remained in possession of the property. Relevant here are plaintiff's desperate circumstances and her relative lack of sophistication. Builders claims that 83-year-old Willens was 20 years older than plaintiff and, like plaintiff, never completed high school. We decline, however, to equate Willens' level of sophistication and business experience with that of plaintiff, given that Builders for 60 years was in the business of buying and rehabilitating distressed properties. Moreover, Bruno represented Builders throughout the transaction while plaintiff did not have an attorney prior to or at the time she conveyed the deeds. We also find it significant under *Flack* that plaintiff has remained in possession of the house throughout the proceedings.

■ Builders asserts that the trial court properly found that no indebtedness existed between the parties, relying primarily on *Wilkinson v. Johnson* (1963), 29 Ill. 2d 392, 194 N.E.2d 328, *Stamberg v. Hiller* (1963), 41 Ill. App. 2d 229, 190 N.E.2d 627, and *Anderson v. Combs* (1961), 32 Ill. App. 2d 81, 177 N.E.2d 245. While a debt relationship is essential to a mortgage, direct evidence is not necessary (*McGill v. Biggs*, 105 Ill. App. 3d 706, 434 N.E.2d 772), and, in fact, no particular type of evidence is required. (*Burroughs v. Burroughs*, 1 Ill. App. 3d 697, 274 N.E.2d 376.) Although plaintiff never executed a note or other document which demonstrates the existence of a debt, a number of factors here might suggest a debt relationship. Plaintiff signed the deeds after she told Willens that she needed a loan, and Willens responded that Builders could assist her. Moreover, plaintiff stated that she never intended to sell her property and believed at all times that the transaction constituted a loan. Bruno acknowledged that she initially came to Willens to save her property. Although the documents do not appear to create indebtedness between the parties, the record suggests that the parties' primary intent was to effect a security agreement, rather than an outright sale of the properties.

■ We also conclude that genuine issues of material fact exist as to whether plaintiff defaulted under the agreement. Builders maintains that she defaulted by failing to make any monthly payments under the agreement and failing to reimburse Builders for its rehabilitation costs. However, it is undisputed that when the parties entered the agreement, they expected that the net rentals would cover the required monthly payments. It is also noteworthy that the agreement did not specify any mechanism by which Builders would notify plaintiff of shortfalls in the monthly payments. Despite Builders' claim that it was "clear" by August 1983 that expenditures from the building exceeded the net rentals, it is not clear if and when Builders so informed plaintiff. Builders apparently prepared statements in August and September 1983, which show money due and expenses owed Builders. However, plaintiff stated that she never received such statements and was not informed until January 1984 that she owed Builders money under the agreement, and this was acknowledged by Bruno. Although Builders' 1983 tax return indicated that net rentals exceeded operating costs by more than $7,000, Builders claims that it paid more than $50,000 in expenditures and unpaid taxes for the building during this period. It should be noted that Builders failed to provide plaintiff an accounting prior to its termination of the agreement. It contends that it "effec-

tively" gave her an accounting by producing its records for this lawsuit. The absence of an accounting prior to termination is troubling given that both parties intended plaintiff's payments to come from the net rentals and anticipated that the net rentals would be sufficient to cover the amount required under the agreement.

In summary, we conclude that genuine issues of material fact existed in this case, making disposition by summary judgment inappropriate. We therefore affirm the trial court's order denying summary judgment to plaintiff and reverse that portion of the trial court's order which granted Builders summary judgment and remand with directions to the trial court to conduct a trial on the issues. We decline to address First Federal's argument that even if the conveyances constituted equitable mortgages, First Federal was a *bona fide* purchaser without notice and therefore entitled to foreclosure, leaving such issue for the circuit court. We therefore reverse that portion of the order which entered summary judgment of foreclosure for First Federal.

Affirmed in part; reversed in part and remanded with directions.

RAKOWSKI and LaPORTA, JJ., concur.