# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Hatchett v. W2X, Inc.*, 2013 IL App (1st) 121758

---

| | |
|---|---|
| Appellate Court Caption | HELEN HATCHETT, Plaintiff-Appellant, v. W2X, INC., WARREN JACKSON, KENDRA THOMAS, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC, and SAXON MORTGAGE SERVICES, INC., and UNKNOWN OWNERS AND NONRECORD CLAIMANTS, Defendants (Avalon Betts-Gaston and JP Morgan Chase Bank, N.A., a/t/f holders of Master Adjustable Rate Mortgages Trust 2005-8, Defendants-Appellees). |
| District & No. | First District, First Division<br>Docket No. 1-12-1758 |
| Rule 23 Order filed | May 6, 2013 |
| Rule 23 Order withdrawn | June 11, 2013 |
| Opinion filed | June 24, 2013 |
| Rehearing denied | August 21, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from plaintiff's attempt to save her home from foreclosure by engaging the assistance of an attorney who solicited her to sign documents she thought would add his name to the title to the property, allow her to make no payments for one year and then regain ownership, plaintiff presented a *prima facie* case that the parties intended the transaction to be an equitable mortgage, not a sale, and although a directed finding was properly entered for defendant attorney on the count alleging that she violated the Notary Public Act in notarizing the closing documents, the trial court erred in directing a finding for the attorney on the counts alleging legal malpractice and a breach of her fiduciary duty to plaintiff. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CH-15839; the Hon. William O. Maki, Judge, presiding. |
| Judgment | Affirmed in part; reversed in part; cause remanded with directions. |
| Counsel on Appeal | Legal Assistance Foundation, of Chicago (Michelle A. Weinberg, of counsel), for appellant. |
| | Lillig & Thorsness, Ltd., of Oak Brook (Russell R. Custer, Adrian Mendoza, and Edward R. Sherman, of counsel), for appellee Bank of New York Mellon Trust Company. |
| | Avalon Betts-Gaston, of Matteson, appellee *pro se*. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion. Presiding Justice Hoffman and Justice Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1    This appeal arises from the November 1, 2010 order entered by the circuit court of Cook County, which granted a directed finding against the plaintiff, Helen Hatchett (Helen), and in favor of the defendants, Avalon Betts-Gaston (Attorney Gaston)[1] and The Bank of New York Mellon Trust Company (BONY), and which entered a default judgment against Warren Jackson (Jackson)[2] and in favor of Helen in the amount of $121,158.69. This appeal also arises from the circuit court's February 10, 2011 order denying Helen's motion to reconsider its November 1, 2010 ruling. On appeal, Helen argues that the circuit court erred in granting a directed finding in favor of BONY and Attorney Gaston. For the following reasons, we

---

[1]Avalon Betts-Gaston is a party before this court on appeal.

[2]On June 11, 2007, the trial court entered a default order against Warren Jackson, who is not a party before this court on appeal.

affirm in part and reverse in part the judgment of the circuit court of Cook County, and remand the cause for further proceedings.

¶ 2                                    BACKGROUND

¶ 3        On August 26, 2005, a foreclosure action was filed against Helen in the circuit court of Cook County[3] for a mortgage loan pertaining to her house located at 10458 South Vernon Avenue in Chicago, Illinois (the property), where she had lived since 1970. In September 2005, Helen received a solicitation flyer from W2X, Inc. (W2X),[4] a company operated by Jackson, which purportedly offered to save her home from foreclosure. Jackson's telephone number was listed on the flyer. Helen, a senior citizen with limited education, contacted Jackson for help. The next day, Jackson visited Helen's home, during which Helen signed documents and gave Jackson a copy of her driver's license. Helen did not know what documents she had signed. According to Helen, Jackson explained that his name would be on the title of her house, that Helen could "have the house back" in her name within a year, that Jackson "would deal with the other lawyer on foreclosure," and that Helen would make no payments on her loans for one year. Jackson allegedly assured Helen that she did not need to read the forms. However, Helen knew that some of the signed documents pertained to "some kind of contract."

¶ 4        On September 26, 2005, Attorney Gaston, who owned a real estate law practice, received a facsimile of a real estate contract bearing Helen's signature as the seller of the property. Kendra Thomas (Kendra)[5] was listed on the real estate contract as the buyer of the property. Attorney Gaston then reviewed the real estate contract to "make sure that everything was filled out." According to Attorney Gaston's trial testimony, she often received client referrals from Jackson in 2005, and that either Jackson or a realtor named Shunte Thomas (Shunte) referred Helen's real estate transaction to her. Attorney Gaston then spoke with Helen by telephone, during which they discussed the broad terms of the real estate contract, and Attorney Gaston asked Helen whether she had any questions about it. However, Attorney Gaston did not make any notes contemporaneous with the telephone conversation. Attorney Gaston had an assistant at her law office whose responsibility included contacting clients, informing them of closing dates and locations, and performing other office tasks. Based on the telephone conversation, it was clear to Attorney Gaston that Helen intended to convey her property. On October 5, 2005, at approximately 10 p.m., Attorney Gaston, as counsel for Helen, prepared a warranty deed which described the terms of Helen's conveyance of the property to Kendra. Attorney Gaston also prepared other closing documents on behalf of Helen, including an affidavit of title and a bill of sale. A power of attorney was also prepared as a "backup" because Attorney Gaston's assistant had informed her that Helen would be

_____

[3]National Credit Financial v. Hatchett, No. 05 CH 14548 (Cir. Ct. Cook Co.).

[4]W2X, Inc., is not a party before this court on appeal.

[5]All counts against Kendra Thomas were dismissed with prejudice pursuant to a settlement agreement; thus, Kendra Thomas is not a party before this court on appeal.

unable to attend the closing due to illness. On October 6, 2005, Attorney Gaston gave the closing documents to her assistant to acquire Helen's signature. Later that day, on October 6, 2005, Jackson arrived at Attorney Gaston's law office with the original closing documents, which had been prepared by Attorney Gaston and given to her assistant earlier that day. Each of those closing documents bore what appeared to be Helen's signature. Jackson also physically produced Helen's driver's license. According to Attorney Gaston, Jackson informed her that Helen was waiting in the car, and that she was ill and could not climb the stairs to Attorney Gaston's third-floor office. Attorney Gaston testified at trial that she did not go downstairs to see Helen, and trusted Jackson's information to be the truth. Attorney Gaston, who was also a registered notary public in 2005, then notarized the documents after comparing the signatures on the documents with Helen's signature on her driver's license. It is stipulated by the parties that Attorney Gaston's assistant notarized the power of attorney purportedly signed by Helen.

¶ 5        On October 7, 2005, a closing was held for the property at issue during which Attorney Gaston purportedly acted as counsel on behalf of Helen. The contract sales price for the property was $145,000. The buyer of the property, Kendra, executed two mortgage loans in the total amount of $137,750 from mortgage lender, American Home Mortgage Corp. (AHMC), an entity doing business as American Brokers Conduit. It is stipulated by the parties that Mortgage Electronic Registration Systems, Inc. (MERS),[6] as "nominal mortgagee" of AHMC, was the record mortgagee on the subject property with the Cook County recorder of deeds. It was further stipulated by the parties that MERS later assigned its interest in the mortgage loans at issue to American Home Mortgage Servicing, Inc. (AHMS),[7] which subsequently assigned its interest in the mortgage loans to BONY in July 2010. At the time of the October 7, 2005 closing, the total payoff or redemption amount owed on Helen's home was approximately $12,635, plus $4,238.65 owed for a lien on the property and $1,091.01 owed for property taxes. As a result of the sale of the property to Kendra, Helen's debt on her home was satisfied by a portion of the sale proceeds. The resultant *net* sale proceeds was then issued by the closing agent for Kendra's mortgage lender in the form of two checks made payable to Helen in the amounts of $117,959.50 and $3,199.19. Attorney Gaston gave the check made payable to Helen in the amount of $117,959.50 to Shunte, whom Attorney Gaston knew worked with Jackson. It is undisputed, however, that both of these checks were deposited into the banking account of W2X, the company operated by Jackson, and that Helen only received $3,000 from Jackson in connection with the sale of her home. Attorney Gaston received fees pertaining to the closing of the subject mortgage loan transaction in the amount of $1,186, which included "title services" fees received as "issuing agent" and fees earned as the seller's attorney.

---

[6]Mortgage Electronic Registration Systems, Inc., was dismissed with prejudice from the instant lawsuit pursuant to a settlement agreement, and is not a party before this court on appeal.

[7]Although unclear in the record, it appears that at some point, JP Morgan Chase Bank, N.A., as predecessor-in-interest to BONY, and Saxon Mortgage Services, Inc., also held a mortgage interest in the subject property.

Subsequently, the warranty deed transferring record title of the property from Helen to Kendra was recorded with the Cook County recorder of deeds.

¶ 6　　On August 7, 2006, Helen filed a complaint for quiet title against W2X, Jackson, Kendra, MERS, American Brokers Conduit, Attorney Gaston and "unknown owners and nonrecord claimants," alleging that the defendants engaged in fraudulent actions and seeking a declaration that the warranty deed conveying property title to Kendra was in fact an equitable mortgage and that the subsequent mortgage on the property was void. On August 22, 2006, a *lis pendens* relating to Helen's cause of action was recorded with the Cook County recorder of deeds.

¶ 7　　On June 11, 2007, an order of default was entered against Jackson. On December 22, 2009, Helen filed an amended complaint for quiet title, which omitted American Brokers Conduit as a named defendant, but added JP Morgan Chase Bank, N.A.(Chase Bank),[8] and Saxon Mortgage Services, Inc. (Saxon),[9] as named defendants.

¶ 8　　On March 16, 2010, Helen filed an 11-count second amended complaint for quiet title and other relief (second amended complaint) against W2X, Jackson, Kendra, MERS, Attorney Gaston, Chase Bank, Saxon, and "unknown owners and nonrecord claimants." Count I of the second amended complaint alleged quiet title against Kendra and "unknown owners and nonrecord claimants," arguing that the warranty deed transferring title of the property from Helen to Kendra should be properly construed as the granting of an equitable mortgage. Count II alleged quiet title against Kendra, and mortgagees Chase Bank and Saxon, arguing that Kendra's attempt to encumber the property with a mortgage loan was void and that Chase Bank and Saxon had notice that Kendra held only an equitable mortgage interest in the property. Count III alleged that Jackson, W2X and Kendra violated the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 2008)). Count IV alleged common law fraud against Jackson, W2X and Kendra, arguing that their fraudulent misrepresentations and omissions induced Helen to enter into the subject transaction. Count V alleged that the terms of the transaction were unconscionable and that Jackson, W2X and Kendra wrongfully exploited the large disparity in bargaining power over Helen. Count VI alleged that Jackson and W2X breached a fiduciary duty to perform the duties they had advertised to Helen by engaging in deceptive acts, practices, misrepresentations, and omissions. Count VII alleged that Attorney Gaston engaged in official misconduct under the Illinois Notary Public Act (5 ILCS 312/1-101 *et seq.* (West 2008)) in notarizing the closing documents. Counts VIII and IX alleged that Kendra violated the Truth in Lending Act (TILA) (15 U.S.C. § 1602(h) (2006)) and the Home Ownership and Equity Protection Act of 1994 (HOEPA) (15 U.S.C. § 1602(aa) (2006)), respectively, in

---

[8]Prior to trial, The Bank of New York Mellon Trust Company, N.A., f/k/a The Bank of New York Trust Company, N.A., became a "successor-in-interest" to JP Morgan Chase Bank, N.A. The Bank of New York Mellon Trust Company, N.A., is a party before this court on appeal.

[9]Saxon Mortgage Services, Inc., was dismissed with prejudice from the instant lawsuit pursuant to a settlement agreement, and is not a party before this court on appeal.

engaging in the subject transaction with Helen. Counts XI[10] and XII, respectively, alleged that Attorney Gaston fraudulently breached her fiduciary duty to Helen, and committed negligence and attorney malpractice in representing Helen. In sum, the complaint presents an example of "equity stripping" in the context of a mortgage rescue fraud scheme.

¶ 9    On March 26, 2010, BONY filed an appearance before the trial court as a "successor-in-interest" to Chase Bank and took assignment of the subject mortgage in July 2010. On July 26, 2010, pursuant to settlement, MERS and Saxon were dismissed from the lawsuit with prejudice.

¶ 10    On June 10, 2010, pursuant to leave of the trial court, BONY filed a third-party complaint for declaratory judgment against First American Title Insurance Company (First American). On July 29, 2010, BONY filed a motion for default order (motion for default) against First American for its failure to appear or respond to BONY's third-party complaint. On August 19, 2010, the trial court entered an order stating that BONY's motion for default is withdrawn and that First American is granted leave to appear instanter and to file a responsive pleading. On October 26, 2010, the trial court entered an agreed order to stay the third-party action pending resolution of Helen's quiet title claims in the case.

¶ 11    On October 28, 2010, a bench trial commenced during which Helen, Helen's daughter Deborah Hatchett (Deborah), Attorney Gaston, Kendra and bank representative Jose Colon (Colon) testified. At trial, over the objections by Helen's counsel, the trial court found that a 2008 Attorney Registration and Disciplinary Commission (ARDC) complaint against Attorney Gaston was inadmissible because it was "more prejudicial than probative." Further, all counts against Kendra were dismissed with prejudice pursuant to a settlement agreement (counts VIII and IX in which she was solely named; counts I to V in which she was named in conjunction with other defendants).[11]

¶ 12    On November 1, 2010, at the close of Helen's case-in-chief, BONY and Attorney Gaston made an oral motion for a directed finding against Helen. The trial court[12] granted Attorney Gaston's motion for a directed finding and dismissed counts VII, XI and XII, noting that Helen had offered no testimony regarding "the prevailing standard of care in determining whether [Attorney Gaston] under the circumstances deviated from the professional standard." In granting BONY's motion for a directed finding and dismissing counts I and II,[13] the trial court found that, based on the testimony regarding Helen's conduct and the conduct of her

---

[10]The second amended complaint did not contain a count X.

[11]Pursuant to a settlement agreement prior to trial, Kendra agreed to execute a quitclaim deed to Helen for the property in exchange for dismissal with prejudice of all claims against Kendra in the cause of action.

[12]Presided over by Judge William O. Maki.

[13]Only count II alleging quiet title in the second amended complaint specifically pertained to BONY. However, the trial court also simultaneously dismissed count I alleging quiet title against Kendra and "unknown owner and nonrecord claimants" when it dismissed count II.

family members, "the understanding was that [Helen] was to receive value for the equity in her house," and that neither the purchase price of $145,000 nor the fact that "the debts that were paid off as a result of that closing" were unconscionable. Specifically, the trial court found that Helen did not meet the elements for her claim under count II, which pled an action to quiet title against Kendra, Saxon, and BONY, as successor-in-interest to Chase Bank, and that, in reviewing the totality of the evidence, there was no conduct on the part of the lender that would warrant requiring BONY to relinquish its interest in the property. As a result of the June 11, 2007 default order entered against Jackson, the trial court entered judgment against Jackson and W2X on counts III and IV in the amounts of $117,959.50 and $3,199.19–the exact amount of net sale proceeds deposited into W2X's account in 2005 after the closing for the property. The court also struck counts V and VI against Jackson and W2X.

¶ 13    On November 29, 2010, Helen filed a "motion to reconsider and for clarification" (motion to reconsider) of the trial court's November 1, 2010 ruling, and, in the alternative, requested that the trial court "clarify that it has made no findings with respect to the ownership and chain of title to the Note secured by the subject mortgage, or the knowledge of the original lender, and that such matters remain to be decided by the foreclosure court." On January 5, 2011, pursuant to leave of the trial court, Helen filed a supplemental memorandum in support of her motion to reconsider. On February 10, 2011, the trial court[14] denied Helen's motion to reconsider in its entirety, "with respect to both the separate requests to reconsider and request for clarification."

¶ 14    On March 9, 2011, Helen filed a notice of appeal (case No. 1-11-0751). On May 8, 2012, this court dismissed Helen's appeal for lack of jurisdiction, holding that Helen may not prematurely appeal the cause of action while BONY's third-party action against First American was still pending in the trial court, absent an express written finding under Illinois Supreme Court Rule 304(a). Ill. S. Ct. R. 304(a) (eff. Jan. 1, 2006). *Hatchett v. W2X, Inc.*, 2012 IL App (1st) 110751-U.

¶ 15    On May 25, 2012, the trial court entered an order dismissing without prejudice BONY's third-party action against First American. On June 18, 2012, Helen filed the instant notice of appeal (case No. 1-12-1758).

¶ 16                                          ANALYSIS

¶ 17    The relevant inquiry on appeal before us is whether the trial court erred in granting a directed finding in favor of BONY and Attorney Gaston.

¶ 18    As a preliminary matter, Helen argues that the trial court improperly excluded evidence of a 2008 ARDC complaint against Attorney Gaston, which contained allegations of misconduct resembling those leveled against Attorney Gaston in the instant case. Specifically, Helen contends that the 2008 ARDC complaint was relevant to demonstrate Attorney Gaston's fraudulent intent in the case at bar.

¶ 19    BONY and Attorney Gaston assert that the trial court acted within its discretion to

---

[14]Presided over by a different judge.

exclude the 2008 ARDC complaint from the evidence at trial. Specifically, BONY contends that Helen failed to establish how the court's ruling substantially prejudiced her case, that she failed to address the trial court's reasoning for not admitting it into evidence, and that the 2008 ARDC complaint had minimal potential relevance but a high potential prejudicial effect upon the instant case.

¶ 20    The decision to admit or exclude evidence rests within the sound discretion of the trial court, and that decision will not be disturbed absent an abuse of that discretion. *Law Offices of Colleen M. McLaughlin v. First Star Financial Corp.*, 2011 IL App (1st) 101849, ¶ 28. "Even when evidence is relevant, a trial court may exclude it, if the prejudicial effect of the evidence substantially outweighs its probative value." *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 821-22, 893 N.E.2d 949, 964 (2008). Prejudice is "undue tendency to suggest a decision on an improper basis." *Id.* at 822, 893 N.E.2d at 964-65.

¶ 21    In the case at bar, over objections by Helen's counsel at trial, the trial court found the 2008 ARDC complaint against Attorney Gaston to be inadmissible because it was "more prejudicial than probative." The record shows that the 2008 ARDC complaint contained six counts of misconduct against Attorney Gaston, and alleged, in detail, that Attorney Gaston was contemporaneously involved in very similar "foreclosure rescue" schemes, with often overlapping co-participants, against owners of five other properties. As Helen points out in her brief, although evidence of other bad acts is generally inadmissible to show bad character, such evidence "is admissible for other purposes, such as proof of *** intent, *** knowledge, *** or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Through the so-called doctrine of chances (see *People v. Brown*, 199 Ill. App. 3d 860, 875, 557 N.E.2d 611, 621 (1990)), the ARDC complaint serves as strong proof of Attorney Gaston's intent, knowledge, and absence of mistake relating to her participation in the alleged scheme against Helen. Attorney Gaston claimed to have been an unwitting participant in any fraud perpetrated against Helen. With the ARDC complaint properly admitted, Attorney Gaston would be left to claim that she was repeatedly duped in the same way, by the same people, in a manner that consistently inured to her and her associates' financial benefit. With all of these instances considered together, Attorney Gaston's claimed credulity becomes more remarkable, and less believable. Because the ARDC complaint contained allegations which highly resembled the allegations asserted by Helen against Attorney Gaston in the instant case, we find the ARDC complaint to be highly probative evidence.

¶ 22    The trial court deemed the ARDC complaint unfairly prejudicial on the basis that it evinced unproven allegations, not proven convictions. Although a court may exclude even relevant evidence where its probative value is substantially outweighed by the danger of unfair prejudice (Ill. R. Evid. 402 (eff. Jan. 1, 2011)), the balance does not dictate exclusion here. Evidence of other bad acts often comes in the form of other-crimes evidence (see generally Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 404.5 (7th ed. 1999)), but the rule allowing evidence of other bad acts is not limited to proven criminal convictions. See Ill. R. Evid. 404(b) (allowing evidence of other "wrongs[ ] or acts" in addition to evidence of "other crimes"). The unproven nature of the ARDC complaint might well affect its weight, but it does not affect its admissibility. Thus, we hold that the

trial court's exclusion of the ARDC complaint constituted an abuse of discretion. Accordingly, we consider the allegations of the ARDC complaint in our resolution of the issues in this appeal.

¶ 23    BONY objects to footnote 10 of Helen's opening brief before this court, which referenced a March 30, 2011 ARDC Hearing Board's recommendation of disbarment, the June 29, 2011 suspension of Attorney Gaston's attorney license, and a July 6, 2011 federal grand jury indictment against Attorney Gaston for fraud.[15] BONY argues that these matters were improperly cited by Helen in her opening brief and that they were not properly supplemented to the record. We agree that footnote 10 should be stricken from Helen's brief where the ARDC Hearing Board's recommendation, the suspension of Attorney Gaston's attorney license, and the indictment brought against Attorney Gaston occurred *after* the bench trial had been held in Helen's instant quiet title lawsuit and, thus, these matters were never properly presented before the trial court at trial.

¶ 24    BONY further argues that this court should dismiss Helen's appeal in its entirety for lack of jurisdiction, where the June 18, 2012 notice of appeal failed to reference the trial court's February 10, 2011 order denying Helen's motion to reconsider. BONY posits that because all the issues raised in Helen's opening brief were addressed in her motion to reconsider, which she failed to appeal, we have no jurisdiction over this appeal. Further, BONY asserts that Helen failed to set forth any arguments on appeal regarding the issue of *res judicata*, an issue that was raised in her motion to reconsider; thus, Helen had forfeited any review of this issue on appeal.

¶ 25    Helen counters that this court has jurisdiction to review all of her arguments on appeal, where the purported deficiency in the notice of appeal was one of form, rather than substance, and the opposing parties were not prejudiced by the omission of the February 10, 2011 order in the notice of appeal.

¶ 26    Supreme Court Rule 303(b)(2) provides that a notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." Ill. S. Ct. R. 303(b)(2) (eff. Sept. 1, 2006). The filing of a notice of appeal is the "jurisdictional step which initiates appellate review." (Internal quotation marks omitted.) *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 176, 950 N.E.2d 1136, 1143-44 (2011). "A notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts of judgments specified in the notice of appeal." *Id.* at 176, 950 N.E.2d at 1144. However, where a deficiency in the notice of appeal is one of form, rather than substance, and the appellee is not prejudiced, the failure to strictly comply with the form of notice is not fatal. *Id.*

¶ 27    Our review of the record shows that the June 18, 2011 notice of appeal listed the trial court's November 1, 2010 order granting a directed finding against Helen, and its May 25, 2012 order dismissing BONY's third-party action against First American, as the "judgment/order being appealed." Although the trial court's February 10, 2011 order denying Helen's motion to reconsider was omitted from the notice of appeal, we find such omission

---

[15]Attorney Gaston's brief on appeal makes no mention of Helen's references to these events.

to be one of form rather than substance, where the arguments raised in the motion to reconsider related to the same issues raised throughout the litigation. Further, neither BONY nor Attorney Gaston argues that it was prejudiced by this omission. Thus, the notice of appeal properly conferred jurisdiction upon this court. While this court has jurisdiction over this appeal, we agree with BONY that any arguments not raised by Helen in her opening brief, even though they may have been raised in the motion to reconsider, will not be considered by this court. See Ill. S. Ct. R. 341(h) (eff. Sept. 1, 2006) ("[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 28     Turning to the merits of this appeal, we determine whether the trial court erred in granting a directed finding in favor of BONY and Attorney Gaston.

¶ 29     Helen first argues that the evidence at trial established that the warranty deed conveying the property to Kendra was void because Helen's signature on the warranty deed was a forgery. Nonetheless, she contends that even if the signature on the warranty deed was genuine, the warranty deed was void because it was procured through "fraud in the factum."

¶ 30     BONY and Attorney Gaston counter that Helen's arguments of forgery and "fraud in the factum" have been forfeited for review on appeal. Attorney Gaston specifically contends that Helen has forfeited review of these claims because they were raised for the first time on appeal. BONY contends that these issues are not properly before this court on appeal because they were never pled in her second amended complaint, and that Helen's claim of forgery was negated by the judicial admissions in her trial pleadings that she had signed the warranty deed at issue.

¶ 31     We agree with BONY and Attorney Gaston that Helen's claims of forgery and "fraud in the factum" are not properly before this court. "A party must recover, if at all, according to the case he had made for himself by his pleadings." *American Standard Insurance Co. v. Basbagill*, 333 Ill. App. 3d 11, 15, 775 N.E.2d 255, 259 (2002). "Proof without pleadings is as defective as pleadings without proof." *Id.* Although the record shows that Helen's counsel orally alluded to the issue of forgery in response to BONY's and Attorney Gaston's motions for a directed finding at trial, we find that Helen's second amended complaint, upon which she sought relief at trial, was devoid of any allegations of forgery or "fraud in the factum." Further, there is no indication in the record that Helen sought to amend her second amended complaint at any time to include these claims. Therefore, we hold that Helen has forfeited her assertions of forgery and "fraud in the factum" on appeal. See *id.* (holding that plaintiff has forfeited review of an unpleaded assertion on appeal even though plaintiff raised the argument at trial).

¶ 32     Moreover, we agree with BONY's contention that Helen's arguments of forgery were negated by the judicial admissions in her trial pleadings that she had signed the warranty deed at issue. "Any admission contained in the original verified pleading, which is not the product of mistake or inadvertence, is a binding judicial admission." (Internal quotation marks omitted.) *Nissan Motor Acceptance Corp. v. Abbas Holding I, Inc.*, 2012 IL App (1st) 111296, ¶ 19. Such an admission has the effect of withdrawing a fact from issue in the case, making it unnecessary for the opposing party to present evidence in support thereof. *Id.* In

the case at bar, several of Helen's pleadings, including the second amended complaint and a declaration filed in response to Attorney Gaston's motion for summary judgment, repeatedly asserted that she "signed" the warranty deed at issue. Helen does not allege that the inclusion of this information in her pleadings was a product of mistake or inadvertence. Thus, we find the assertions in her trial pleadings to be binding judicial admissions that barred any arguments that her signature on the warranty deed was forged.

¶ 33　　Helen acknowledges in her reply brief that she did not specifically plead forgery in her second amended complaint, but nonetheless argues that she could not have pled this theory of relief until the trial–during which Attorney Gaston's testimony revealed that the warranty deed at issue had not yet existed at the time Helen signed documents with Jackson in September 2005. We reject this argument. As BONY points out, the record shows that, 14 days *prior* to Helen's filing of the second amended complaint, Attorney Gaston filed a reply in support of her motion to dismiss Helen's amended complaint, which specifically stated the date and time that Attorney Gaston had prepared the warranty deed. Attached as an exhibit to Attorney Gaston's reply was a draft of the warranty deed, indicating a "creation date" of October 5, 2005 at 10:05 p.m. Thus, we find that Helen had knowledge of the timing and creation of the warranty deed prior to trial, and could have alleged, but did not, forgery in her second amended complaint. Although she was entitled to do so, there is no indication in the record that Helen sought leave of court to amend the second amended complaint at any time. Therefore, Helen is bound by the judicial admissions that she had personally signed the warranty deed. Accordingly, Helen's assertions of forgery were negated on this basis.

¶ 34　　We now consider the issue that is properly before us, and that is, whether the trial court properly granted a directed finding in favor of BONY and Attorney Gaston. At the close of Helen's case-in-chief at trial, the trial court granted a directed finding in favor of BONY on count II of the second amended complaint, which alleged quiet title against mortgagee Chase Bank, a predecessor-in-interest to BONY. The trial court also granted a directed finding in favor of Attorney Gaston on the claims of violation of the Notary Public Act (count VII), fraudulent breach of fiduciary duty (count XI) and attorney malpractice (count XII).

¶ 35　　When ruling on a motion for a directed finding, the trial court must employ a two-step analysis. *Law Offices of Colleen M. McLaughlin*, 2011 IL App (1st) 101849, ¶ 39. First, the court must determine as a matter of law whether the plaintiff has established a *prima facie* case. *Id.* A plaintiff presents a *prima facie* case when he or she presents some evidence on each element essential to the cause of action. *Minch v. George*, 395 Ill. App. 3d 390, 398, 917 N.E.2d 1169, 1177 (2009). Second, if the plaintiff has presented some evidence on each element, the court then must consider and weigh the totality of the evidence presented, including evidence favorable to the defendant, to determine whether the *prima facie* case survives. *Id.* If the trial court finds that the plaintiff has failed to establish a *prima facie* case as a matter of law, the appellate standard of review is *de novo*. However, if the trial court moves on to consider the weight and quality of the evidence and finds that no *prima facie* case remains, the appellate standard of review is manifest weight of the evidence. *Warning v. City of Joliet*, 2012 IL App (3d) 110309, ¶ 24. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly apparent. *Id.*

¶ 36　　The parties disagree as to the proper standard of review in this case. Helen advocates a

*de novo* standard of review, arguing that the trial court made no findings of fact in this case and that it found that she failed to establish a *prima facie* case as a matter of law. BONY argues that this court should review the trial court's decision under a manifest weight of the evidence standard, arguing that the trial court made factual findings and weighed the trial evidence in granting BONY's motion for a directed finding. Attorney Gaston simply sets forth the manifest weight of the evidence standard in her brief as the proper standard of review.

¶ 37    Based on our review of the transcript of the bench trial proceedings, we find that the trial court did not proceed to the second step of the analysis under BONY's and Attorney Gaston's motions for a directed finding, which compels us to review the trial court's decision *de novo*. Although the record indicates that the trial court made various remarks, in ruling on BONY's and Attorney Gaston's motions for a directed finding, which BONY points out could arguably be construed as factual findings, a reading of the entirety of the court's ruling and remarks persuades us that the trial court found that Helen failed to establish a *prima facie* case as a matter of law at the first step of the analysis. The trial court explicitly held that Helen "had not met the elements" on count II as it related to BONY, and, in dismissing counts VII, XI and XII against Attorney Gaston, the court explained that "there has been no testimony offered as to what the prevailing standard of care [is] in determining whether [Attorney Gaston] under the circumstances deviated from the professional standard." It is for these reasons that we review the trial court's decision *de novo*.

¶ 38    Count II of the second amended complaint sought to quiet title to the property on the basis that Kendra had only acquired an "equitable mortgage" on the property, rather than an outright purchase of the property; that Kendra's subsequent attempt to encumber the property with the mortgage interests was void; and that Chase Bank, as predecessor-in-interest to BONY, had notice that its mortgage interest was subject to Helen's claims in the instant case.

¶ 39    The Illinois Mortgage Act defines a "constructive mortgage" as "[e]very deed conveying real estate, which shall appear to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage." 765 ILCS 905/5 (West 2010). "To convert an absolute deed into a mortgage, the proof must be clear, satisfactory and convincing and may come from 'almost every conceivable fact that could legitimately aid that determination.' " *Robinson v. Builders Supply & Lumber Co.*, 223 Ill. App. 3d 1007, 1014, 586 N.E.2d 316, 320 (1991) (quoting *McGill v. Biggs*, 105 Ill. App. 3d 706, 708, 434 N.E.2d 772, 773 (1982)); 765 ILCS 940/55(b) (West 2010) ("[t]he remedies and rights provided for in [the Mortgage Rescue Fraud Act] are not exclusive, but cumulative, and all other applicable claims, including, but not limited to, those brought under the doctrine of equitable mortgage, are specifically preserved"). In determining whether an equitable mortgage exists, courts consider several factors, including a debt relationship; close relationship of the parties; prior unsuccessful attempts for loan; the lack of legal assistance; the inadequacy of consideration; an agreement to repurchase; and the continued exercise of ownership privileges and responsibilities by the seller. *Gandy v. Kimbrough*, 406 Ill. App. 3d 867, 876-77, 941 N.E.2d 329, 336-37 (2010). "The parties' intentions are the key consideration and the proof of these factors must be clear, satisfactory and convincing if they are to overcome a written instrument." (Internal quotation marks omitted.) *Id.* at 877, 941

N.E.2d at 337. Further, the existence of a debt relationship is essential to establish an equitable mortgage. *Nave v. Heinzmann*, 344 Ill. App. 3d 815, 823, 801 N.E.2d 121, 127 (2003) (citing *McGill*, 105 Ill. App. 3d at 708, 434 N.E.2d at 774); *Flack v. McClure*, 206 Ill. App. 3d 976, 985, 565 N.E.2d 131, 136 (1990).

¶ 40     Helen argues that the evidence established that the conveyance of her property was an equitable mortgage, whereby the warranty deed was executed as security in exchange for a loan to save her home from foreclosure, rather than an outright sale. In response, BONY mainly argues that the evidence failed to establish the essential element of a debt relationship between Helen and Kendra.

¶ 41     At trial, Helen testified that after a foreclosure action was filed against her, she received a solicitation flyer which purportedly offered to save her home from foreclosure. Jackson's telephone number was listed on the flyer, and Helen thereafter contacted him. The next day, Jackson visited Helen's home, during which Helen signed some papers and gave Jackson a copy of her driver's license. According to Helen, Jackson informed her that he would put his name on the title of the house, that she would "have the house back" in her name within a year, and that she would make no payments on her loans for a year. Helen testified that she had an eighth-grade education, that she did not read the documents she signed, that Jackson assured her that she did not need to read them, and that Jackson never provided her with copies of the documents she signed. However, she knew that some of the signed documents pertained to "some kind of contract." Helen testified that Jackson never informed her that she was deeding the house to someone else, but acknowledged that she might have signed a real estate sales contract and a power of attorney form. At the time she signed the documents, Helen had never heard of Kendra. Helen testified that Jackson informed her that Attorney Gaston would handle the foreclosure case, after which Helen spoke with Attorney Gaston by telephone on one occasion. During that telephone call, Attorney Gaston did not give any legal advice about the foreclosure case, nor did she explain any of the documents that Helen had signed. Subsequently, the foreclosure proceedings on Helen's home stopped because Jackson had "paid the bank," and Jackson gave Helen $3,000. Helen was shocked to later discover that Kendra was the title owner of the property. Helen testified that at the time she signed the documents, she did not understand that she was completely relinquishing ownership of the property and that, had she known of this consequence, she would not have signed the documents.

¶ 42     On cross-examination, Helen stated that Jackson never informed her that he was a money lender, nor did he inform her that he operated a refinancing company. Prior to meeting Jackson, Helen had not attempted to obtain a refinance loan to stop foreclosure on her home. Helen testified that she signed the documents in the hopes of avoiding foreclosure, and clarified that she expected only Jackson's name to be on the title to the property. On redirect examination, Helen stated that Jackson never used the phrase "buyback," nor did he ever inform her that she had to buy her house back from him. Helen further noted that it was her understanding at the time she signed the documents that both her name and Jackson's name would be on the title of the property.

¶ 43     Kendra testified at trial that, in 2005, she began working for Jackson when she was a 21-year-old college student at DePaul University in Chicago. Jackson described the work to her

as helping individuals in foreclosure situations by allowing them to live rent free for six months, after which the individuals would get their credit back on track and Kendra would deed their properties back to them. Kendra testified that she did not plan to keep the properties, nor did she intend to resell or rehabilitate them. Kendra testified that she knew she would purchase the homes and give them back to the original owners, who continued to live on the properties. Kendra purchased a total of six properties with Jackson in 2005. However, she never engaged in negotiations over the purchase prices of the properties, never met the sellers prior to signing the contracts, and never discussed with the sellers the amount they had to pay in order to regain ownership of their homes. Kendra testified that Jackson provided her with a lump sum of money to "make the payments for the first six months" after conveyance of the properties. Kendra did not execute any written lease agreements with the original owners, who continued to live on the properties after Kendra purchased their homes. Kendra testified that she believed that Attorney Gaston was the legal counsel who represented her in these real estate transactions, but never observed Jackson giving any money to Attorney Gaston. In purchasing these properties, Kendra filled out mortgage loan applications with a mortgage broker or loan officer named Demona Ross (Ross). Kendra testified that, after the real estate transaction at issue occurred and at Jackson's direction, she visited Helen's property and asked Helen whether the house needed repairs. Kendra testified that Helen appeared to understand that Kendra was the new owner of the property, that Kendra informed Helen that Helen could continue to live rent free in the home for six months, but that Helen never made any payments on the property. Subsequently, a foreclosure action regarding this property was filed against Kendra. On cross-examination, Kendra testified that Helen never told her at any point that Helen did not intend to sell the property. Kendra knew she was the buyer of the property at closing. Kendra explained that she would not have entered into the real estate transaction or applied for a mortgage loan on the property had Kendra known that Jackson was engaged in fraudulent actions. Kendra testified that she had no discussions with Attorney Gaston regarding any sale or buyback arrangements regarding the property, and acknowledged that Attorney Gaston never told Kendra that she was Kendra's attorney.

¶ 44    At trial, documentary evidence detailing the real estate transaction, including the warranty deed, real estate contract, Kendra's mortgage loans, a settlement statement, and copies of two checks made payable to Helen, were admitted into evidence.

¶ 45    Based on our review of the record, we find that Helen has made a *prima facie* showing of the essential elements of an equitable mortgage. First, although Helen had never made any payments to Kendra or Jackson with regard to the property, we find a number of factors in the evidence to suggest the existence of a debt relationship. While a debt relationship is essential to establish an equitable mortgage, direct evidence is not necessary to prove the relationship and no particular *type* of evidence is required. *Robinson*, 223 Ill. App. 3d at 1017, 586 N.E.2d at 322; *McGill*, 105 Ill. App. 3d at 708, 434 N.E.2d at 774. Further, "the fact that the mortgage was made for a future debt or that there was no fixed time for repayment does not affect the status of an instrument as a mortgage." *Flack*, 206 Ill. App. 3d at 985, 565 N.E.2d at 136.

¶ 46    It is undisputed that Helen's home was in the process of being foreclosed at the time she

met Jackson. Helen presented evidence that the solicitation flyer sent to her by Jackson offered to save her home from foreclosure. Helen testified that she, in hopes of avoiding foreclosure, signed documents which Jackson presented to her under the belief that he would add his name to the title of her property, that she would make no payments on her loan for a year, and that she would regain sole ownership of her home after a year. Helen testified that she never intended to relinquish complete ownership of her home. Helen also presented evidence that Kendra was an employee of Jackson, that he provided a "lump sum of money" to Kendra for the purpose of paying the first six months of mortgage debt acquired by Kendra on the property, and that Kendra received a salary from Jackson for her help in each real estate "deal." Kendra's testimony revealed that she did not plan to keep, rehabilitate, or resell the property she acquired, testifying that the property would be reconveyed to the original owner after a period of six months. Kendra also testified that Helen was to live rent free in the home for six months after the conveyance at issue, and that she had a discussion with Helen regarding the amount of monthly rent to be paid by Helen at the end of the six-month period. See *Robinson*, 223 Ill. App. 3d at 1017, 586 N.E.2d at 322 (factors suggesting a debt relationship even though the documents did not appear to create indebtedness between the parties included plaintiff's need of a loan and desire to save her property; her lack of intent to sell her property; her belief that the transaction constituted a loan); *McGill*, 105 Ill. App. 3d at 708-09, 434 N.E.2d at 774 (defendant's attempt at collection and own characterization of an agreement to reconvey the property suggested the existence of a debt relationship). Thus, we find that, in the first step of the directed finding analysis, Helen presented sufficient evidence of a debt relationship which constitutes an essential element of an equitable mortgage.

¶ 47    Second, the adequacy of consideration is another factor used to determine the existence of an equitable mortgage. *Robinson*, 223 Ill. App. 3d at 1014, 586 N.E.2d at 320. "Where consideration is grossly inadequate, a mortgage is strongly indicated." *Flack*, 206 Ill. App. 3d at 986, 565 N.E.2d at 137.

¶ 48    At trial, Helen presented an HUD-1 settlement statement (exhibit K) which listed the purchase price of the property as $145,000, and listed approximately $17,965 as the payoff amount and taxes owed on Helen's home. Helen also presented copies of two checks (exhibits I and J), which were made payable to her in the amounts of $117,959.50 and $3,199.19. Helen's testimony revealed that, following the real estate transaction, she only received $3,000 from Jackson. It is undisputed by the parties that both of these checks were deposited into the bank account of W2X, the company operated by Jackson. Kendra's testimony shows that Helen was expected to pay at least $700 in monthly rent, after the six-month period, toward Kendra's newly acquired mortgage on the property. Helen presented evidence, through bank representative Colon's testimony, that Kendra's mortgage loans on the property amounted to 95% of the value of the property. In granting BONY's motion for a directed finding, the trial court remarked that "this case really comes down to two exhibits, [exhibits I and J]," and the "purported real estate contract." The trial court noted that neither the purchase price of $145,000 nor the debts that were satisfied as a result of the closing could be deemed unconscionable.

¶ 49    However, we find that Helen presented sufficient evidence of the inadequacy of

-15-

consideration. Although Helen's initial debt in the amount of approximately $17,965 was satisfied at closing, Helen only received $3,000 of the remainder of the $145,000 purchase price and was expected to contribute approximately $700 monthly rent toward Kendra's mortgage loans. In essence, Helen only received approximately $20,965 in benefits, while the payback amount required of Helen far exceeded that amount. Thus, we find that, in the first step of the directed finding analysis, Helen presented sufficient evidence of the inadequacy of consideration which is an essential element of an equitable mortgage. See *Gandy*, 406 Ill. App. 3d at 878, 941 N.E.2d at 337-38 (finding a vast disparity of consideration where surrogate buyer paid a purchase price of $90,000, with a net payout to homeowner of the property of $71,000; homeowner sent $22,900 back to surrogate buyer; and surrogate buyer resold property to a third party for a contract price of $170,000).

¶ 50       Other relevant factors that courts may consider in determining the existence of an equitable mortgage include any prior attempts to obtain a loan; the lack of legal assistance; an agreement to repurchase; and the continued exercise of ownership privileges and responsibilities by the seller. *Id.* at 876-77, 941 N.E.2d at 336-37. At trial, Helen testified that she had not made any prior attempts to obtain a refinance loan to stop foreclosure on her home, and that, after meeting Jackson, she only spoke with Attorney Gaston on one occasion. Evidence was presented that Helen was an elderly homeowner with an eighth grade education at the time she signed the documents, and that Kendra was a 21-year-old college student who did not intend to keep, rehabilitate or resell Helen's property. Both Helen and Kendra testified that they believed the property would be deeded back to Helen after a certain period of time. Evidence was presented that the relationship between Helen and Kendra was limited to the real estate transaction, which was orchestrated by Jackson. Helen also presented evidence that she continued to live in the home after the transaction took place, but that Kendra, as the new title owner of the property, visited Helen to inquire whether the house needed repairs. Evidence was presented at trial that Kendra never engaged in negotiations over the purchase price of the property, did not meet Helen prior to signing the real estate contract, and did not discuss with Helen the terms for regaining ownership of her home. See *id.* at 877-78, 941 N.E.2d at 337-38 (finding the existence of an equitable mortgage where the parties' relationship was limited to the real estate transaction which was brought together by a third party; an attorney nominally represented the seller; a debt relationship existed; the sophistication of the parties was limited; and consideration was inadequate); see also *Robinson*, 223 Ill. App. 3d at 1016-17, 586 N.E.2d at 322-23 (relevant factors include the plaintiff's desperate circumstances, lack of sophistication, and lack of legal representation, and the existence of a debt relationship). Therefore, we find that, in the first step of the directed finding analysis, Helen presented a *prima facie* case to suggest that the parties intended the real estate transaction to be an equitable mortgage, rather than an outright sale. Accordingly, we hold that the trial court erred in granting BONY's motion for a directed finding as a matter of law on count II. In light of this holding, we reject Helen's argument that BONY failed to establish its affirmative defense of *bona fide* purchaser, where BONY, as a result of the trial court's granting of its motion for a directed finding, had not yet had the opportunity to present its evidence.

¶ 51       Next, we determine whether the trial court erred in granting a directed finding in favor

of Attorney Gaston on counts VII, XI and XII.

¶ 52     Count VII of the second amended complaint alleged that Attorney Gaston engaged in official misconduct under the Illinois Notary Public Act (5 ILCS 312/1-101 *et seq.* (West 2008)) in notarizing the closing documents. Counts XI and XII, respectively, alleged that Attorney Gaston fraudulently breached her fiduciary duty to Helen and committed attorney malpractice in representing her. At the close of Helen's case-in-chief, the court granted Attorney Gaston's motion for a directed finding and dismissed counts VII, XI and XII, noting that Helen had not offered any expert testimony regarding "the prevailing standard of care in determining whether [Attorney Gaston] under the circumstances deviated from the professional standard."

¶ 53     Helen argues that the trial court erred in granting Attorney Gaston's motion for a directed finding, stating that expert testimony was not required to establish the standard of care in meeting the elements of counts VII, XI and XII because Attorney Gaston's conduct was "grossly and obviously negligent, if not reckless and wanton." Further, she contends that no expert testimony was required because the attorney misconduct did not involve the making of a legal judgment.

¶ 54     Attorney Gaston counters that expert testimony was required to set forth Helen's *prima facie* case on counts VII, XI and XII because, without such expert testimony, it would be impossible for a layperson to determine whether (1) the use of only a person's driver's license in notarizing documents constituted attorney misconduct; (2) speaking only once to Helen as a client during a short period of representation violated rules of professional responsibility; (3) giving a check from the sales proceeds of the transaction to a realtor, Shunte, violated rules of professional responsibility; or (4) Attorney Gaston should have known that Jackson, Ross and Shunte were purportedly conspiring to defraud Helen.

¶ 55     The failure to present expert testimony is usually fatal to a plaintiff's legal malpractice action. *Barth v. Reagan*, 139 Ill. 2d 399, 407, 564 N.E.2d 1196, 1200 (1990). However, Illinois courts have recognized that "where the common knowledge or experience of laypersons is extensive enough to recognize or infer negligence from the facts, or where an attorney's negligence is so grossly apparent that a lay person would have no difficulty in appraising it, expert testimony as to the applicable standard of care is not required." *Id.* Helen claims that the circumstances in the case at bar fall under the "common knowledge" exception to the requirement for expert testimony.

¶ 56     The crux of Helen's arguments relating to count VII was that Attorney Gaston violated the Notary Public Act when she, acting as a notary official in 2005, notarized the closing documents bearing Helen's signatures by using only Helen's driver's license for authentication of the signatures without personally observing whether Helen actually signed the documents. Section 6-102 of the Notary Public Act provides:

> "§ 6-102. Notarial Acts. (a) In taking an acknowledgment, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the person appearing before the notary and making the acknowledgment is the person whose true signature is on the instrument.
>
> (b) In taking a verification upon oath or affirmation, the notary public must

determine, either from personal knowledge or from satisfactory evidence, that the person appearing before the notary and making the verification is the person whose true signature is on the statement verified.

(c) In witnessing or attesting a signature, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the signature is that of the person appearing before the notary and named therein.

(d) A notary public has satisfactory evidence that a person is the person whose true signature is on a document if that person:

(1) is personally known to the notary;

(2) is identified upon the oath or affirmation of a credible witness personally known to the notary; or

(3) *is identified on the basis of identification documents*." (Emphasis added.) 5 ILCS 312/6-102 (West 2008).

"Satisfactory evidence" is generally defined as "[e]vidence that is sufficient to satisfy an unprejudiced mind seeking the truth." (Internal quotation marks omitted.) *Vancura v. Katris*, 238 Ill. 2d 352, 388, 939 N.E.2d 328, 350 (2010) (quoting Black's Law Dictionary 639 (9th ed. 2009)). "Official misconduct" is defined in the Notary Public Act as "the wrongful exercise of a power or the wrongful performance of a duty." 5 ILCS 312/7-104 (West 2008). Under the statute, "a notary public, whose inherent function is to serve as an unprejudiced witness, must satisfy himself of the truth of a signer's identity." *Vancura*, 238 Ill. 2d at 388, 939 N.E.2d at 350. "The specific manner in which the notary should do so is left to the notary, but *** the Act establishes that a notary who does so in a negligent or reckless manner has committed 'official misconduct' and is liable for any damages so caused." *Id.*

¶ 57    At trial, Attorney Gaston testified that, on October 6, 2005, Jackson arrived at Attorney Gaston's law office with signed copies of the closing documents which she had prepared the night before. Each of the closing documents bore what appeared to be Helen's signature. Jackson physically produced Helen's driver's license. According to Attorney Gaston, Jackson informed her that Helen was waiting in the car, and that she was ill and could not climb the stairs to the third-floor law office. Attorney Gaston testified that she did not go downstairs to see Helen and trusted Jackson's information to be the truth. She further testified that, based on her prior telephone conversation with Helen, it was clear to Attorney Gaston that Helen intended to convey her property. Thereafter, Attorney Gaston notarized the documents after comparing, to her satisfaction, the signatures on the documents with Helen's signature on her driver's license. Attorney Gaston's notary certification, however, stated in pertinent part that Helen "appeared before [her]" on that day to execute the documents.

¶ 58    The parties here specifically disagree as to the interpretation of section 6-102(d)(3). While Helen argues that the provision does not allow the presentment of identification documents as a substitution for personally appearing before the notary public, Attorney Gaston asserts that the statute permits such substitution. The interpretation of a statute is a question of law. *Central Mortgage Co. v. Kamarauli*, 2012 IL App (1st) 112353, ¶ 15. We find that, under the terms of the statute, Attorney Gaston's conduct in comparing the signatures on the documents with Helen's signature on her driver's license, without seeing

Helen in person, did not constitute a valid notarization. See generally *Bowe v. Chicago Electoral Board*, 79 Ill. 2d 469, 404 N.E.2d 180 (1980). However, the questions of whether Attorney Gaston breached her duty as a notary official under the Notary Public Act and whether any alleged misconduct proximately caused Helen's injury are questions of fact. *Merca v. Rhodes*, 2011 IL App (1st) 102234, ¶ 41; *Barth*, 139 Ill. 2d at 411-12, 564 N.E.2d at 1202 (plaintiff must prove a causal connection between the attorney's alleged negligent act and resultant injury in order to sustain a legal malpractice claim).

¶ 59    We find that Helen did not present evidence, either by expert testimony or otherwise, of any causative link between the manner in which Attorney Gaston chose to confirm Helen's identity–by comparing Helen's driver's license signature with the signatures on the closing documents without witnessing Helen sign the forms–and Helen's claimed injury.

¶ 60    Further, as discussed, Helen was judicially bound by her trial pleadings that she had in fact signed the warranty deed conveying the property, and she could not assert that the signatures were forged in order to establish Attorney Gaston's violation of the applicable standard of care or any causal connection between the alleged negligence and resultant injury. See generally *Barth*, 139 Ill. 2d at 411, 564 N.E.2d at 1202 ("[f]iling falsely notarized or improperly verified court documents is indeed wrongful and, if an aggrieved client can establish a forgery as a fact, it can be used as evidence of an attorney's violation of the applicable standard of care"). In her reply brief, Helen argues that, even if her signatures were genuine, they were procured by fraud. However, as discussed, any assertion of "fraud in factum" had long been forfeited where Helen's second amended complaint was devoid of any such allegations. Thus, we find that Helen had not presented a *prima facie* case to sustain her claim of a violation of the Notary Public Act. Therefore, the trial court properly granted a directed finding in favor of Attorney Gaston on count VII of the second amended complaint.

¶ 61    Counts XI and XII of the second amended complaint alleged that Attorney Gaston fraudulently breached her fiduciary duty to Helen (count XI) and committed negligence and attorney malpractice in representing her (count XII). Specifically, count XI alleged that Attorney Gaston's conduct "constitutes fraudulent breach of fiduciary duty, or, in the alternative, an intentional breach of her duties to her client." Count XII incorporated the same factual allegations as count XI, but alleged that Attorney Gaston's conduct "constitutes negligence and malpractice in breach of the attorney's duty to her client."

¶ 62    To establish a *prima facie* case for fraudulent breach of fiduciary duty, a claim which sounds in fraud, a plaintiff is required to produce evidence that: (1) the defendant made a false statement of material fact; (2) the defendant knew the statement to be untrue; (3) the plaintiff had the right to rely on the statement; (4) the plaintiff did rely on the statement; and (5) an injury resulted. *State Security Insurance Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 591-92, 630 N.E.2d 940, 943 (1994). "The intentional omission or concealment of a material fact may be the basis of a fraud action if a special or fiduciary relationship exists which gives rise to the duty to speak." *Id.* at 592, 630 N.E.2d at 943. Here, there was undoubtedly a special fiduciary relationship between Helen and her legal counsel, Attorney Gaston. Helen asserts that, despite this fiduciary relationship, Attorney Gaston failed to inform her of the actions Attorney Gaston would take on her behalf, or to apprise her of the

nature of the transaction into which Helen was entering. This omission, Helen argues, caused her to surrender substantial equity in her home.

¶ 63    The record establishes that Helen had presented evidence in support of these assertions. In her own testimony, Helen stated the Attorney Gaston did nothing to explain or discuss the terms of the transaction in which she was representing Helen, as her lawyer. The evidence further shows that Attorney Gaston became involved in this case at the behest of other defendants, and worked with them and not Helen. This evidence, along with the ARDC complaint and Helen's testimony regarding the defendants' misleading descriptions of the documents she signed, lends credence to the notion that Attorney Gaston and other defendants were complicit in a scheme to defraud Helen. Further, Helen testified that Attorney Gaston never discussed the transaction with her in any detail nor asked her any of the important questions that this highly unbalanced transaction would provoke in an attorney guarding her client's interests. As Helen argues in her brief, this evidence suggests Attorney Gaston's willful blindness to Helen's plight and the fraudulent scheme. Altogether, then, this evidence points to Attorney Gaston's intentional (or willfully blind) failure to inform Helen of facts that would have kept her from entering into a transaction that disproportionately favored the defendants. Thus, we find that Helen presented sufficient evidence to establish her *prima facie* case for fraudulent breach of fiduciary duty. Therefore, the trial court erred in granting a directed finding in favor of Attorney Gaston on count XI.

¶ 64    To sustain a claim for legal malpractice, a plaintiff must show: (1) the attorney owed plaintiff a duty arising from the attorney-client relationship; (2) the duty was breached; (3) the existence of a proximate causal relationship between the attorney's breach of duty and the damages sustained by the plaintiff; and (4) damages. *Fabricare Equipment Credit Corp. v. Bell, Boyd & Lloyd*, 328 Ill. App. 3d 784, 788, 767 N.E.2d 470, 474 (2002). A fiduciary duty exists as a matter of law between an attorney and her client. *Id.* at 791, 767 N.E.2d at 476. An attorney is liable to her client for damages in malpractice actions only when she fails to exercise a reasonable degree of care and skill. *Barth*, 139 Ill. 2d at 406, 564 N.E.2d at 1199. Generally, the failure to present expert testimony is usually fatal to a plaintiff's legal malpractice action. *Barth*, 139 Ill. 2d at 407, 564 N.E.2d at 1200. However, this general rule does not apply where the common knowledge of laypersons allows them to recognize the attorney's negligence. *Id.* at 407-08, 564 N.E.2d at 1200.

¶ 65    Helen argues that Attorney Gaston's conduct in notarizing the closing documents; giving the check made payable to Helen in the amount of $117,959.50 to Shunte instead of Helen; failing to consult with Helen as to Helen's objectives in the legal representation or the means by which Helen's goals were to be pursued; failing to keep Helen reasonably informed as to the date of closing; and failing to explain enough to Helen, was so grossly and obviously negligent that no expert testimony was needed to determine the standard of professional care or breach thereof. In support, Helen references Rules 1.2, 1.4 and 1.15 of the Illinois Rules of Professional Conduct. See Ill. R. Prof. Conduct (2010) Rs. 1.2, 1.4, 1.15 (eff. Jan. 1, 2010) (scope of representation; communication; safekeeping property).

¶ 66    Attorney Gaston counters that expert testimony was required to establish a *prima facie* case for legal malpractice because, without it, it would be impossible for a layperson to know whether speaking only once to Helen during the course of the 37-day legal representation,

or giving the sales proceeds check to realtor Shunte to give to Helen, constituted malpractice. She contends that likewise, absent expert opinion, it would be impossible for a layperson to determine whether Attorney Gaston, under the circumstances, should have known that Jackson, Ross and Shunte were purportedly conspiring to defraud Helen.

¶ 67 Based on our review of the record, we conclude that a layperson would have no difficulty recognizing Attorney Gaston's representation as substandard without the aid of expert testimony if, indeed, Helen's description of what occurred was correct. Helen presented evidence at trial that established the fact that Attorney Gaston never discussed nor explained the terms of the complicated real estate transaction to her. Helen also presented evidence that, after closing, Attorney Gaston gave a check for the sale proceeds and the settlement statement to a third party instead of to Helen. Specifically, she gave it to realtor Shunte, whom Attorney Gaston knew worked with Jackson. Helen presented evidence that Shunte was not the realtor of record in the transaction at issue, but that Shunte, Jackson and Kendra were involved in business together. All of this evidence, if believed, raises the clear inference that Attorney Gaston was not providing even minimal representation of Helen but rather serving the interests of others. Further, Attorney Gaston argues that expert opinion was needed in order for a layperson to determine whether the act of speaking only once to Helen during the course of the 37 days in which she represented Helen, constituted a breach of her duty to Helen. We find that this argument when carefully analyzed does not support Attorney Gaston's argument. Rather it highlights the questionable behavior. It is inconceivable that even a layperson would not look askance at an attorney who spoke only *once* to a client over the course of several weeks in which a complicated real estate transaction was in progress. Further, there is nothing in the record to suggest that the one and only conversation was anything other than cursory and without substance. Thus, we find that, in the first step of a directed finding analysis, Helen presented a *prima facie* case for legal malpractice against Attorney Gaston. Therefore, we hold that the trial court erred in granting Attorney Gaston's motion for a directed finding as a matter of law on count XII.

¶ 68 Accordingly, since Helen presented sufficient evidence to establish a *prima facie* case on counts II, XI and XII, a directed finding was precluded and should not have been granted.

¶ 69 For the foregoing reasons, we reverse the judgment of the trial court as to counts II, XI and XII in which the trial court granted a directed finding in favor of BONY and Attorney Gaston. We remand for a new trial only on counts II, XI and XII, but affirm the judgment of the trial court in granting a directed finding in favor of Attorney Gaston on count VII.

¶ 70 Affirmed in part; reversed in part; cause remanded with directions.